J. Erwin McDowell *et al.*

*v.*

John K. Joice *et al.*

*Filed at Ottawa October 26, 1893.*

1. Partnership—*unincorporated association for dealing in land.* An association of thirty persons was organized for the purchase and sale of land for profit, there being no time limited for its duration, and written articles of association were signed by all who became members, by which one of the partners was to take and hold the title to the lands acquired, in trust for the association, and three others were intrusted with the active control of its affairs, and another member was made the attorney of the company, and the scheme contemplated an indefinite series of transactions of the same general character. Subsequently, the same parties who formed this association, with others, signed new articles of agreement and association, whose provisions were substantially like those of the first articles. To each purchase of land the members of the original association, so far as they should choose to take part, and such others as should become associated with them, were to be parties: *Held,* that as these associations were unincorporated, they presented, in each case of purchase, the legal attributes of a partnership, and for the purpose of determining the fiduciary relations existing between the association and its members, the association itself, through all the mutations in its membership, might be regarded, in equity, as an ideal entity, involving and possessing equitable rights and relations at least analogous to those existing between partners.

2. Same—*partner dealing for his own profit—liability to account.* Where an association of many persons is formed for the buying and selling of land, whereby they become partners in the business, they will be incapacitated from dealing clandestinely, in respect to the common enterprise, for their own private benefit, and if they do so, all profits thereby made by them will inure to the benefit of the association, and they will be compelled to account therefor.

3. In such case, until the relation of membership of the association is terminated by some unequivocal act on their part, the members and officers of the association are bound to act for the promotion of the common interest, and are incapable of dealing secretly, either with or for the association, for their own benefit.

4. In this case, about thirty persons entered into written articles of association for the purchase and sale of lands for profit, without any limitation as to the duration of the business. Under this agreement one tract of land was bought, upon which a profit was derived There-

upon three of the members, who were officers of the association, bought one hundred and sixty acres of land for $32,000, taking the title in another person for their use, and induced the association to purchase the same for $56,000, whereby they realized $24,000 profit on their original purchase. Some persons not members also joined in the purchase by the association : *Held,* that the transaction as to the one hundred and sixty acre tract was a fraud upon the association, and that the members practicing the fraud were liable to account to their associates for the profits thus realized by them.

5. In such case, whether there was or was not more than one association made no difference. The second agreement to purchase the one hundred and sixty acre .tract was but an enlargement of the first, adapted to the new conditions, and it in no way extinguished the first. The mere fact that other persons united with those, or a part of those, in the original transaction, did not change the duties and obligations of the persons entrusted with its affairs. The success of the first venture was the basis of the second, and the frauds derived from the first were largely used in carrying through the second.

6. SAME—*bill against partner to account for profits, derived through fraud.* Where two members of an association jointly interested in the purchase of land to be re-sold for profit, succeed in clandestinely realizing profits at the expense of their firm or the association, the other members, or a part of them, for and on behalf of themselves and the others, may file a bill against the members so deriving a profit, requiring them to account to the firm or association for the same. By failure to rescind the purchase the other parties or associates will not waive the fraud practiced on them.

7. PARTIES—*in chancery—bill by a part of persons interested.* A bill in chancery may be filed .by some of a very numerous body of shareholders in an unincorporated association, to enforce a common benefit in behalf of a class of persons, against a few of their associates who are especially charged with fraud. In such case it is not necessary that all the parties in interest shall be made parties to the bill.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

This was a bill in chancery, brought by John K. Joice and others, against J. Erwin McDowell and others, the complainants and defendants all being members of an unincorporated voluntary association formed for the purpose of buying and selling lands, to compel the defendants to account for and

pay over to the association certain profits made and retained by them in purchasing a tract of land for the association. The defendants appeared and answered, and the cause being heard on pleadings and proofs, a decree was rendered in accordance with the prayer of the bill. On appeal to the Appellate Court the decree was affirmed, and the present appeal is from the judgment of affirmance. In the Appellate Court, the following opinion was delivered by Mr. Justice Shepard:

"In October, 1890, about thirty persons, including the appellants Maggs, Gilliland and J. E. McDowell, organized an association, under the name of the Cook County Land Investment Association, which was in effect a partnership, for the purpose of dealing in land. No time was limited for its duration. Articles of association and agreement were reduced to writing and signed by all who became members. The writing provided, among other things, that Stephen B. Van Kirk, one of the partners, should take and hold title to all lands which might be acquired, in trust for the partnership, and that three other partners, Maggs, McClennan and Church, should be a managing committee, to whom should be entrusted the active control of the affairs of the association. Shortly afterwards, and on the twenty-eighth day of the said month, the said managing committee bought a tract of 20 acres of land in this county, and ten days later sold the same at a price which netted a profit of nearly $20 on each share of stock on which $25 had been paid. The defendant J. Erwin McDowell acted as the attorney of the association in all legal matters pertaining to the said purchase and sale, and he was one of the partners. No complaint is made of the administration of the affairs of the association connected with this first purchase and sale.

"Immediately after the sale of said 20-acre tract, and before the transaction had been entirely closed up as between the members of the association, Maggs, who was one of the managing committee, Van Kirk, who was trustee appointed to take

and hold title, and Gilliland, who was a partner in the association, went out and examined another tract of 160 acres, which at that time belonged to one Thomas Lewis, and such negotiations were subsequently had, by the intervention of J. Erwin McDowell, who knew Lewis, as resulted, on November 15, 1890, in an agreement by Lewis to sell the land for $32,000, which was at the rate of $200 per acre. Some delays occurred, and it was not until about two weeks later that the contract was actually reduced to writing and signed. The written contract provided for a sale by Lewis to one Anderson E. Martin, who was first seen or known by Lewis in the transaction at the time of executing the contract, and the payment of $1000 as earnest money. Martin was a friend of McDowell and Gilliland. The written agreement was dated on November 29, but, the earnest money not having been raised, it was not signed by Lewis until at the time the $1000 was paid to him, on December 3, 1890. Thereupon the following circular was prepared:

" '*November 29, 1890.*

" '*To the Subscribers of the Cook County Land Investment Ass.:*

" 'We have an option on 160 acres at Harvey, one mile frontage on Western avenue, running from 151st street to 159th street, at $350 per acre. It is our opinion that this property can be very rapidly turned over at a magnificent advance, and as it is necessary to raise one-fifth the amount of the purchase money inside of sixty days, the shares will be of the value of $125, payable $25 cash, $25 one year, $25 two years, $25 three years, and $25 four years, with six per cent interest. Before closing this deal we must have the shares guaranteed, as it will take five hundred shares to carry through.

" 'Place your names on other side, and mark against same number of shares you would like allotted to you.

" 'Respectfully yours,     Managing Committee.'

"The circular was passed around, and signed by Maggs, Gilliland and McDowell, and many others, with the number of shares each desired to take marked against their names. Martin did not sign, but following under McDowell's name, McDowell wrote, 'Grantor agrees to take last one hundred shares, if not otherwise disposed of,' and McDowell testified that by 'grantor' he meant Martin. On the same day of the signing of the contract of sale from Lewis to Martin, Martin gave a contract of sale of the same premises to Van Kirk, as trustee, for $56,000, which was at the rate of $350 per acre. Thereupon McDowell, on December 3, 1890, issued the following circular to the members of the syndicate who had signed the circular issued by the managing committee:

" '*To the Cook County Land Investment Co.:*

" 'In accordance with your instructions, I have this day secured a contract with A. E. Martin for the sale of the east half of the east half of section 13, township 36 north, range 13, east of the third principal meridian, and have delivered thereon, as a deposit, the $1000 furnished by your company, and have placed the contract with the Merchants' National Bank, subject to the joint order of Martin and myself. This contract calls for the payment of $10,200 within sixty days from November 29, 1890, at which time the deed is to be given, together with four notes of $11,200 each, due in one, two, three and four years from November 29, 1890.

12/3/90.                    J. ERWIN MᶜDOWELL.'

"Up to this time there had been no steps taken for the formation of a new association, unless, perhaps, the fact that individuals who had not been interested in the syndicate that bought the first 20 acres had subscribed to the circular sent out by the managing committee concerning the purchase of the 160 acres might be so considered. J. Erwin McDowell, who acted as attorney in all legal matters pertaining to the first purchase, was acting as such in the 160-acre purchase,

and, so far as appears, the old association was still in active existence. Both the contracts for the sale by Lewis to Martin, and by Martin to Van Kirk, as trustee, bore the same date, and were by their terms to be performed within precisely the same time. Van Kirk had refused to act alone as trustee in the 160-acre purchase, because he feared so great a responsibility, and it had been agreed that J. Erwin McDowell should act with him in that matter as co-trustee.

"On January 14, 1891, a meeting of the managers of the association was held, and the proceedings of that meeting appear sufficiently in the following circular of the treasurer of the association sent to the several members:

> "'Cook County Land Investment Co.,
> *Room 70, 159 LaSalle Street.*

"'At a meeting of the managers of the Cook County Land Investment Company, held at 7:30 P. M., January 14, the trustees' and treasurer's reports were read and accepted, and a dividend declared of $19.50 per share, thus closing out the purchase and sale of 20-acre tract at Harvey.

"'A tract of 160 acres at same place was contracted for on the 29th day of November, 1890, and $1000 paid on December 3 last, as earnest money, and balance of first payment, viz., $10,200, has to be paid on January 28, when a deed will be given to Stephen Van Kirk and J. E. McDowell, (attorney,) acting as joint trustees. Subscribers to this deal must pay their first installment of $25 per share to the treasurer on or before the 20th day of January, as in case of non-payment by that date the managing committee will have to dispose of shares to other parties, for if money is not paid and deed taken up on the 28th inst. the $1000 earnest money will be forfeited.

"'Treasurer has in his possession $347.50 to your credit. Kindly remit balance due, viz., $27.50, to secure your shares in 160-acre deal, and return your receipts for shares in old deal, upon receipt of which treasurer will forward you a new one.

> C. H. Beister, *Treasurer.*'

9—149 Ill.

"It thus appears that the managing committee at this meeting transacted business in reference to both the 20-acre and the 160-acre deals, and that the investment and income from the 20-acre deal could apply toward subscriptions to the 160 acres.

"Van Kirk had objected to signing purchase money notes for the large amount of deferred payments going to Lewis, and so had Martin, and Lewis himself seems to have been unwilling to execute the covenants in a warranty deed wherein the consideration to be expressed was $24,000 greater than what he was to receive.   These difficulties were overcome by Martin directing Lewis, in writing, to make a deed to John S. McDowell, a brother of J. Erwin McDowell, who, it was arranged, should take the title for the stockholders and execute the notes and trust deeds for the balance due to Lewis and for the excess over what was going to Lewis, and by the giving by John S. McDowell to Lewis a writing exempting Lewis from liability on his covenants beyond the consideration of $32,000, which he was actually to receive.   These writings were as follows:

"'Chicago, Ill., *January 28, 1891.*

"'*Thomas Lewis, Esq.:*

"'Dear Sir—Please make deed of conveyance of a certain contract made with me November 29, 1890, now in escrow in the Commercial National Bank, to John S. McDowell. I have relinquished all right to said contract.

"'Yours truly,          A. E. Martin.'

"'*Thomas Lewis, Esq.:*

"'Having taken the land in the above assignment by warranty deed for $56,000, I agree that the warranty shall not extend to more than $32,000.

Dated January 28, 1891.          John S. McDowell.'

"Lewis then conveyed the land to John S. McDowell, and received from J. Erwin McDowell $7000 in cash and two notes of $8000 each, payable in three and four years, respect-

ively, with interest, secured by a first lien on the property by trust deed to John N. Olmstead, executed by John S. McDowell; and as of the same date, John S. McDowell executed a second trust deed to Newton Wyeth, trustee, securing nine notes, one each for $2000 and $1200, due in one year, one each for $2000 and $1200, due in two years, two for $3000 and one for $1200, due in three years, and one for $6000 and one for $1200, due in four years,—a total of thirteen notes.

"New articles of agreement and association were prepared by J. Erwin McDowell, and submitted at the meeting on January 14, 1891, and were signed by some seventy-five persons, including McDowell and Gilliland. The provisions of the new agreement were substantially like those of the first articles, excepting that they provided for John S. McDowell as a co-trustee with Van Kirk, and specified the particular tract of 160 acres that had been purchased. All who had signed the first agreement were given an opportunity to sign the last one, and many did so. In consequence of the purchase being a much larger one, quite a number of persons became subscribers to the new purchase who were not interested in the first or 20-acre transaction. We can not go into all the details of the two purchases without extending this opinion to an undue length. Enough has been stated to show the facts upon which the bill was based, for the purpose of holding Gilliland, McDowell and Martin as trustees, and to avoid the trust deeds and notes given to secure payment of the difference between what Lewis sold the land for and the price at which it was turned over to the association.

"The defense rests mainly upon the contention that there were two entirely distinct associations, and that the defendants were not agents of either one in the 160-acre transaction, and while there is evidence tending to establish the defense, the overwhelming weight of the evidence, in our opinion, sustains all the material allegations of the bill.

"The master found the facts to be substantially as stated in the bill, and the circuit court entered a decree finding that the association was a co-partnership; that J. Erwin McDowell was its attorney, and that both he and Gilliland were members of the partnership; that Martin never had any *bona fide* interest in the 160 acres, but was a mere instrument of Gilliland and J. Erwin McDowell to defraud their co-partners, and had knowledge of their unlawful scheme; that J. Erwin McDowell, Gilliland and Martin were joint tort feasors, and must account for the $3200 received by them from the association over what was paid to Lewis, and that the notes secured by trust deed for $20,800, representing the difference between what was agreed to be paid to Lewis and what the land was turned into the association at, should be given up and canceled and that trust deed released.

"We think the decree of the circuit court was most clearly right. Whether there was or was not more than one association in fact, can make no difference. The second agreement was but an enlargement of the first, adapted to the new conditions. It in no way extinguished the first. The mere fact that other persons united with those, or a part of those, in the original transaction, could not change the duties and obligations of the persons entrusted with its affairs. The success of the first venture was the basis of the second, and the funds derived from the first were largely used in carrying through the second. No pretense was made of any independence between the two transactions, or that all who were in the first should not be in the second, provided they put up the additional funds needed, and no one interested in the first, outside of the fraudulent scheme involved in the second, was informed of any change in the relations of the parties, until it became necessary to assert that such a change had taken place in order to defend against the iniquity complained of. The scheme to buy the land of Lewis through an intermediary, and turn it over to the association at an increased price of $24,000,

was a fraud upon every member of the association who joined in that purchase. The parties to that fraudulent scheme were trustees, and the circuit court rightly so held. The remarks of the court on the last page of the opinion, in *Robbins* v. *Butler*, 24 Ill. 387, are pertinent here. There is nothing in the character of the defense, that we can discern, recommending it to the favorable consideration of a court of equity.

"The objections to the form of the decree are not sustainable. The bill is filed by some of a very numerous body of shareholders to enforce a common benefit in behalf of a class of persons, against a few of their associates who are specially charged with fraud, and as such is maintainable. The distribution of the fruits, by way of money, of the decree, is a question for which the court would always be open. *Cockburn* v. *Thompson*, 16 Ves. Jr. 327.

"The decree of the circuit court will be affirmed."

Messrs. Pence & Carpenter, for the appellants:

Neither Gilliland, McDowell nor Martin was the agent of either the first or second syndicate in the purchase of the 160 acres from Lewis, nor either of them such agent in the purchase from Martin.

Where an agent authorized to sell land of his principal at a fixed price sells it for a higher price, he must account to his principal for the excess, but he is not answerable to the purchaser of the land for such excess.

Where one who has been negotiating for the purchase of land from the owner, before having consummated his contract of purchase sells the land at a higher price than he knows he can buy it for, and thereafter conveys or causes to be conveyed said premises to his vendee, his action does not constitute a fraud upon his vendee. *Merryman* v. *David*, 31 Ill. 404.

If it were conceded, for the argument, that Gilliland and McDowell were the agents of the syndicate in making this purchase, and concealed their interest, theretofore obtained,

in the sale, that would be sufficient ground upon which to have the sale set aside by complainants, at their option, but they can not elect to take the land, affirm the sale, and at the same time recover for the profits made by such agents. They must either affirm or disaffirm. They can not do both at the same time. *Ely* v. *Hanford*, 65 Ill. 267.

Martin, and Gilliland and McDowell under him, became interested in the premises in question before the second syndicate or association was formed, and although Gilliland and McDowell became members of the second association subsequently, they had a right to sell the property to the association of which they became members, at any price that might be agreed upon between them, no matter what it may have originally cost. *Oil Co.* v. *Densmore*, 64 Pa. 43.

The association depended upon the judgment of their own officers, and did not authorize Martin, Gilliland or McDowell to buy the property for them. They bought this property of Martin, and not through Martin, Gilliland or McDowell, as agents of the association, and hence there was no confidential relation, and no fraud in fact.

Messrs. ALDRICH, PAYNE & DeFREES, Mr. CHARLES S. BABCOCK, and H. H. C. MILLER, for the appellees:

The association is to be governed by the law relating to partnerships. *Delmonico* v. *Roundebush*, 2 McCrary, 23; *Pettis* v. *Atkins*, 60 Ill. 454.

Partners can not secretly make a profit for themselves. They must be loyal to the purposes of their firm. Bates on Partnership, sec. 307; *Morrill* v. *Colehour*, 82 Ill. 618; *Roby* v. *Colehour*, 135 id. 329; *Faulds* v. *Yates*, 57 id. 416.; *Emory* v. *Parrot*, 107 Mass. 95; *Grant* v. *Hardy*, 33 Wis. 668.

The dealings between attorney and client are held, as against the attorney, *prima facie* fraudulent. *Morrison* v. *Smith*, 130 Ill. 304; *Harper* v. *Perry*, 28 Iowa, 57.

An agent can not become the purchaser from himself, nor can he set up a nominal vendee, as was done in this case. *Tyler* v. *Sanborn,* 128 Ill. 136 ; *Hughes* v. *Washington,* 72 id. 84 ; *Kerfoot* v. *Hyman,* 52 id. 512 ; *Porter* v. *Woodruff,* 36 N. J. Eq. 174 ; Bigelow on Frauds, 272 ; Hovenden on Frauds, 147.

It was not necessary to make all the members of the association parties to the bill. *Cockburn* v. *Thompson,* 16 Ves. 351 ; Collyer on Partnership, sec. 1120, *et seq.;* Story's Eq. Pl. sec. 115.

Mr. Justice Bailey delivered the opinion of the Court :

In the opinion of the Appellate Court, a copy of which will be found in the foregoing statement, the facts necessary to a proper understanding of the case are sufficiently set forth, and as we are disposed to concur substantially with both the reasoning and the conclusions of that court, but little need be added, except by way of discussing a little more fully one or two propositions which are pressed upon our attention with especial earnestness. In their arguments here, counsel for the appellants have labored strenuously to show that, although the same persons were, to a very large extent, associates in both enterprises, the association which purchased the 160-acre tract of land is to be regarded, both in fact and in law, as wholly distinct from the one which had previously purchased and sold the 20-acre tract, and therefore that the relations of McDowell and Gilliland to the first association can not be resorted to for the purpose of determining their duties and obligations to the second.

As these associations were unincorporated, they of course presented in each case the legal attributes of a partnership, and as under the rules applicable to partnerships, the retirement of an old member, or the admission of a new one, operates as a technical dissolution of the old and the formation

of a new firm, it can not be doubted that the two associations, considered merely in the light of the law applicable to partnerships, were numerically distinct. But while this is so, it is apparent from the evidence, that the scheme in pursuance of which the Cook County Land Investment Association was formed, contemplated an indefinite series of transactions of the same general character, through all of which the association itself was to maintain its identity. To each purchase of land, the original associates, so far as they should choose to take part, and such others as should become associated with them, were to be parties. As the association did not see fit to become legally possessed of the attribute of perpetual succession by becoming incorporated, its operations necessarily involved, in case of each purchase, the formation of what was technically a distinct partnership, but that was merely incidental to the general plan upon which the association proposed to transact its business.

For the purpose of determining the fiduciary relations existing between the association and its members, the association itself, through all the mutations in its membership, may be regarded, at least in equity, as an ideal entity, involving and possessing equitable rights and relations, which if not identical with, were at least analogous to, those existing betwen partners. The persons who formed the association and who were members at the time of the purchase of the first tract of land, were partners as to that transaction, and as such were incapacitated from dealing clandestinely in respect to the common enterprise for their own benefit, and if they had attempted to do so, by the well established rules applicable to partnerships, all profits thereby made by them would have enured to the benefit of the association, and they would have been compellable to account therefor. This is so elementary that it will scarcely be disputed. But they were not merely partners in that particular deal, but they were also members of the association. As such, and until the relation was termi-

nated by some unequivocal act on their part, they were bound to act for the promotion of the common interest, and were incapable of dealing secretly, either with or for the association, for their own benefit. Doubtless, if they had announced their withdrawal from membership, or had in any way manifested their election to no longer remain members, they would have been at liberty to deal with the association as strangers. But until that was done, the relation of at least a *quasi* partnership, with all the legal consequences resulting from that relation, continued, and they were incapable of dealing with the association, at least without its full knowledge and consent, for their own profit.

Gilliland and McDowell were both members of the association and partners in the first purchase, and instead of withdrawing from the association, or in any way apprising their associates of their intention to assume a hostile attitude, they continued to act apparently for the promotion of the common enterprise, and became subscribers in the new deal by which the 160 acre tract was purchased. Taking advantage of their position as associates, they succeeded in inducing the association to take the 160 acre tract off their hands at $24,000 in excess of what it had cost them, thus realizing from the transaction that sum as their profit. This was done by interposing Martin, a mere go-between or "man of straw" between Lewis, the owner of the land, and the association, and the profits thus realized were divided between them and Martin.

That the transaction was a fraud upon the association is, in our opinion, too plain for controversy. But it is contended that, even if that is so, the only remedy of the association was by rescission, and that, having failed to rescind, it must be deemed to have affirmed the transaction and waived the fraud. In this view we are unable to concur. McDowell and Gilliland, being members of the association, and jointly interested with the other associates in the common enterprise, they are placed in substantially the same equitable position

in which partners stand who have succeeded in clandestinely realizing profits at the expense of their firm, or agents who have in like manner realized profits at the expense of their principal. In such cases, rescission may or may not be an appropriate remedy, as it may often happen that innocent third parties have interests in the transaction, against whom the right of rescission can not be asserted. But in such cases, the defrauded firm or principal may always have a remedy by calling upon the partner or agent to account to his firm or principal, for the profits thus wrongfully and fraudulently realized.

We are of the opinion that the decree is warranted by the evidence, and the judgment of the Appellate Court affirming it will be affirmed.

*Judgment affirmed.*