HENRY L. HOSSACK, Appellant, vs. THE OTTAWA DEVEL-
OPMENT ASSOCIATION et al. Appellees.

*Opinion filed February 16, 1910—Rehearing denied April 6, 1910.*

1. VOLUNTARY ASSOCIATIONS—*the articles of association will be given effect as far as possible.* While a voluntary association will generally be treated by the court as a partnership and its members as partners, yet the court will, as far as possible, give effect to the articles of association among the members themselves when they are the only persons interested.

2. SAME—*associations are generally treated as partnerships as to third persons.* If a voluntary association is organized for pecuniary profit it will be generally treated as a partnership, so far as the rights of third persons and the liability of its members to strangers are concerned.

3. SAME—*an association may have transferable shares.* There is nothing illegal in making the shares of a voluntary association transferable, but the transferability of shares makes the association different from an ordinary partnership, and neither a sale of such transferable shares by a member nor the death of a member will work a dissolution of the association.

4. SAME—*articles of agreement cannot be canceled contrary to its terms.* Even though the articles of agreement of a voluntary association be treated as an ordinary partnership contract, such agreement cannot be canceled at the pleasure of any member, contrary to the terms of the agreement.

5. SAME—*effect of making shares of stock transferable.* The fact that the shares of stock in a voluntary association are made transferable is evidence of an intent that the death of a member or a transfer of stock shall not work dissolution of the association.

6. CORPORATIONS—*a corporation not for pecuniary profit may take and hold necessary real estate.* A corporation not for pecuniary profit may take and hold as much real estate as is necessary for the purposes of its organization, and if the organization of a particular corporation is authorized by law and the holding of real estate is necessary to the purposes of its organization, its power to hold real estate cannot be questioned in a collateral proceeding.

7. SAME—*when a corporation may act as trustee.* A corporation may take and hold land as trustee if the trust is within the general scope of the purposes of the organization of the corporation or relates to matters which will promote and aid the general purposes of such corporation.

8. The court reviews the evidence in this case, and holds that it fails to establish the complainant's charge of fraud and mismanagement in the affairs of the defendant development association and the sales of land made in pursuance of its plans, and holds that upon this record the syndicate agreement and declaration of trust involved are not contrary to public policy, as enabling a corporation to do indirectly what it could not do directly.

APPEAL from the Circuit Court of LaSalle county; the Hon. RICHARD M. SKINNER, Judge, presiding.

BUTTERS & ARMSTRONG, for appellant.

W. D. FULLERTON, DUNCAN, DOYLE & O'CONOR, RECTOR C. HITT, and LESTER H. STRAWN, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a bill in chancery filed by appellant, in behalf of himself and all others similarly situated, against the Ottawa Development Association, Lorenzo Leland, Lorenzo Leland, trustee, the Ottawa Silica Company, the Ottawa Chautauqua Association, the unknown owners and holders of certificates in the Ottawa Development Syndicate Fund, and the unknown owners and parties interested in the Valley addition to the city of Ottawa, Illinois, for the purpose of procuring a dissolution and equitable division and settlement among the equitable owners and parties interested therein, of certain property purchased with a fund composed of the subscriptions of over a thousand persons residing in Ottawa and vicinity, the legal title to the real estate in question being in Lorenzo Leland, and also to set aside certain conveyances of real estate by said Leland to the Ottawa Chautauqua Association and the Ottawa Silica Company. The original bill was filed August 31, 1907. A motion was made by appellee Leland to dismiss the bill for want of sufficient parties. Each of the other defendants interposed a demurrer to the original bill. The demurrers and motion were overruled by the trial court, and there-

after each defendant filed an answer, and the case was referred to a master in chancery to take and report proofs. The complainant obtained leave to file an amended bill on June 21, 1909. Leland renewed his motion to dismiss the amended bill for want of parties, the same being overruled. He then filed a demurrer to the amended bill, which was overruled and by which he elected to stand. The answers of the other defendants were ordered to stand as answers to the amended bill. The case was heard upon the master's report of the proof taken before him and a decree entered dismissing the bill for want of equity. From this decree an appeal was prayed to this court.

The Ottawa Development Association was organized January 24, 1899, under the laws of Illinois as a corporation not for pecuniary profit, its object being, as stated in its charter, "to secure a union of the energies, influences and action of citizens in matters pertaining to the public welfare of the city of Ottawa, to encourage all legitimate enterprises, and to provide for the frequent meeting and conference of business men and active citizens." The members and directors of the association serve without pay. The initiation fee was five dollars and monthly dues one dollar. Its members took up the work of the association, and in September, 1899, after negotiations with Monroe Seiberling with reference to erecting a plate glass factory on the bank of the Illinois river just west of Ottawa, a public meeting of the citizens of Ottawa was called to consider the question of establishing such a factory. The proposition of Seiberling was to locate the factory for a bonus of $100,000 cash and certain land. This plan was submitted to the public meeting held in pursuance of the call of the Ottawa Development Association on September 8, 1899. It was decided at the meeting to form what was to be known as the Ottawa Development Syndicate, by getting as many as possible of those present to sign a subscriber's agreement and by appointing committees to

canvass the city and ask citizens to subscribe. This sub-scriber's agreement was in the following language:

"We, the undersigned, covenant and agree * * * to execute and deliver, on or before the 20th day of September, 1899, to Charles E. Hook, treasurer of the Ottawa Development Association, * * * our several notes for the amounts set opposite our respective names, due and payable as follows, * * * for the following purposes, to-wit:

"*First*—To purchase about 752.12 acres of land, * * * as platted by Charles F. Wilson August 30, 1899, and upon which the said Ottawa Development Association now has options. The title to said lands to be held in trust by some person to be selected by the association, in trust for the purposes hereinafter set forth, such person to be known as the trustee.

"*Second*—To use, improve, develop and dispose of said lands with a view of increasing the population and business in said city of Ottawa and of benefiting the holders of certificates. * * *

"*Third*—To provide a fund to be used as a bonus to secure the location of a plate glass factory, according to the proposition made by Monroe Seiberling and his associates to the said Ottawa Development Association; but it is agreed that failure of the third purpose shall not in any manner affect the first or second purpose.

"It is further agreed that the title to said lands shall be taken in the name of a trustee to be selected by the said Ottawa Development Association, to be held by him in trust for the purpose of locating manufacturing institutions thereon by donating portions thereof to such institutions, and for the purpose of platting portions thereof into lots, to be exchanged for preferred certificates, and to be sold for cash for the benefit of the holders of common certificates. It is further agreed that for the sum of $50 paid by any subscriber hereto he shall receive two certificates of $50 each, one to be called 'preferred' and to be redeemable

in lots, and the other to be called 'common' and represent the interest of the holder in the proceeds and profits of this undertaking, both of said certificates to be transferable.. * * * It is further agreed that said Ottawa Development Association shall have the full and exclusive management and control of said lands and of the action of the trustee in regard thereto and of all the business connected with this undertaking, * * * it being understood that the powers of said Ottawa Development Association, hereby created, are only limited by the requirement that it completes the purposes of this agreement as speedily as practicable."

Both forms of certificate referred to in said agreement stated which kind they were, and that the person named therein was entitled to so many shares, subject to the agreements of the original syndicate subscription; that the certificate was transferable only by assignment on the back and surrender to the trustee. The common certificate further stated that it only entitled the holder to his proportion of any proceeds or profits of the undertaking. The preferred certificate, in addition to what was stated by both certificates, set forth that it only entitled the holder to exchange, at its face value, in the purchase of lots set aside by the association, at their fair cash value as determined by said association and marked in plain figures on the plat.

Appellant is one of the citizens who attended this meeting and subscribed to the agreement. The plan proposed and adopted was to purchase about 752 acres of farm land adjoining the western city limits of Ottawa, bounded ,on the south by the Illinois river and on the north by the Illinois and Michigan canal. It extended about a mile and a half north and south, of various widths, and belonged to some dozen owners. The prices paid varied from $43.48 to $298.80 per acre, and $57,300 was used in the purchase of this land. It was proposed to raise by popular subscriptions of $50 and multiples, the sum of $165,000. In order

to induce the citizens to become subscribers it was proposed to plat a thousand lots from the land purchased and place a valuation on each lot, so that the aggregate would amount to the aggregate of subscriptions,—that is, $165,-000. The value placed on each lot was a multiple of $50,—that is $100, $150, and so on. Each subscriber was to receive two certificates,—one called "preferred," which could be exchanged at face value for lots and was then to be taken up and canceled, and the other called "common," which represented the interest which the subscribers, after the cancellation of the preferred certificates, had in the syndicate. It was proposed that the preferred certificates were all to be retired by exchange of lots, the common certificates remaining outstanding. Both kinds of certificates were negotiable and transferable, the same as ordinary stock in a corporation. The land to be given to the plate glass factory and the thousand lots to be given to the holders of the preferred certificates would require about 250 acres. The balance of the land purchased was to be used to locate factories by giving bonuses in land, or in cash raised by the sale of land. It was intended that the cash raised by the sale of this land, if not used in locating factories, should be held for the benefit of the holders of the common certificates, and it also appears that a certain tract was set aside for the benefit of the certificate holders, to be sold at some propitious time and the proceeds distributed among them.

In furtherance of this plan a large number of people signed the syndicate agreement, and it appears that some $92,699.50 was paid in, as provided for in said agreement. When the land was purchased the title to the real estate was placed in the name of Lorenzo Leland, a prominent business man and banker of Ottawa, who was also a member of the Ottawa Development Association. At the time this land was purchased in his name he executed the following trust agreement:

"Whereas, certain persons have subscribed to a fund to be paid to the Ottawa Development Association of Ottawa, Illinois, to purchase about 750 acres of land, [giving location,] to use, improve, develop and dispose of said lands, and for other purposes, as will more fully appear from the agreement of said subscribers, being marked 'Exhibit A;' * * * and whereas, said association * * * selected and named as trustee Lorenzo Leland; * * * and whereas, the said * * * association has caused to be conveyed to the said Leland the title to the following described real estate [describing it.] Now, therefore, I, Lorenzo Leland, in consideration of the conveyance to me of the land above described, do hereby declare that I hold the said land in trust for the said Ottawa Development Association, and subject, in all respects, to its control and direction." * * *

Neither Leland nor the Ottawa Development Association was to receive, or has received, any compensation for planning or doing this work.

Difficulty was found in raising by subscription the necessary $100,000 for Seiberling's bonus for establishing the glass factory, and he finally agreed to subscribe $20,000, not to be paid in cash but to be deducted from the cash bonus, leaving it at $80,000, to be paid in monthly installments as the work progressed. He began the work of constructing the factory and continued it for some months, during which time three payments aggregating $12,000 appear to have been paid to him. The work was then stopped for lack of funds. Seiberling proposed to raise the necessary funds to complete the plant by selling a bond issue to be secured on the plant, and stated that in order to do this it would be necessary to have the title placed in him, and therefore Leland, by the advice and direction of the Ottawa Development Association, transferred the title to the land in question as requested by Seiberling. It appears that the largest subscribers to the syndicate agreement were consulted at that time and no objections were made by

them to such conveyances. The trust deed was drawn and the bonds prepared but it was found impossible at that time to float them. Other attempts were made to float a different issue of bonds, which appear to have failed. Thereafter attempts were made by interesting the Olivers, of South Bend, Indiana, and in other ways, to complete the factory. By this time Seiberling had created an indebtedness in trying to erect the plant of $72,000, largely for labor and materials furnished by people of Ottawa. Finally, Seiberling, James Oliver, Joseph Oliver and F. M. Gray entered into an agreement for building and operating a plate glass factory, provided the development association would furnish them a contract for the payment of a $60,000 bonus. This contract was entered into by parties satisfactory to the Olivers and Seiberling, and the company paid off all the indebtedness and started to complete the plant. Shortly thereafter it appears that the plant was sold out to the so-called trust. Seiberling again made a proposition to the people of Ottawa to build a plate glass factory and another arrangement was made with him, and he again failed to complete the factory but induced other parties to take hold of the matter, and finally, some time in 1908, a corporation known as the Federal Plate Glass Company completed the factory.

According to the first agreement made with Seiberling there was to be a cash bonus paid of $100,000, and 43 acres estimated in value at $8299.22, or a total of $108,299.22. When the Federal Plate Glass factory was completed the evidence shows that the actual cost was a cash bonus of $12,000, the 43 acre bonus for the old site, valued at $8299.22, and a land bonus for new site, $2544.38, making a total of $22,843.60, so that the actual cost of locating the glass plant now there was the last named amount, thus saving to the syndicate, by reason of the changes in the contract, $85,455.62.

While these various plans were being formulated and attempts made to carry them out and erect the buildings proposed, many of the subscribers became discouraged and dissatisfied with the project, and in 1906 meetings of the subscribers to the syndicate agreement were called for the purpose of closing up the affairs of the syndicate. The Ottawa Development Association, through its officers, was largely instrumental in getting up these various plans, projects and meetings. One of the meetings for this purpose was held in January, 1907, and the appellant was present. Various plans were considered as to the method of closing out the affairs of the syndicate. At or about that time appellant began purchasing the interests of the various subscribers to the agreement at about sixty per cent, or more, of the face value. Another meeting of the syndicate subscribers was held on February 20, 1907, to receive the report of the committee appointed at one of the previous meetings to audit a complete report of the Ottawa Development Association as to all of the syndicate transactions and accounts, from the signing of the syndicate agreement to December 31, 1906. This meeting adopted the report of the committee, finding the accounts to be correct and making several recommendations, which were afterwards adopted by the Ottawa Development Association. Appellant attended this meeting and expressed himself as satisfied with the report. Some time in the early part of 1907 the last modification of the contracts and arrangement was made, under which the Federal Plate Glass Company has finally erected its plant. At about this time the Ottawa Development Association voted to take in all the syndicate subscribers as members of the association, without requiring them to pay initiation fees.

While these various transactions were being carried on the land was platted, and most, if not all, of the holders of the preferred certificates "levied" upon or selected certain lots and paid for them by giving up these certificates

to the trustee, Leland. Hossack himself, before the filing of the bill in this case, seems to have levied on and selected lots for all of the preferred certificates that he owned originally or purchased from other holders, amounting, as shown by the evidence, to a par value of $14,600. A thirty per cent dividend has been paid on the common stock from moneys subscribed from the sale of lands. This was paid and accepted by the appellant before the suit was started, amounting to thirty per cent on $14,600, or $4380.

The appellant insists that the sale of a portion of the syndicate land to the Ottawa Chautauqua Association is fraudulent and void as to the syndicate subscribers. The chautauqua association was started in 1902 by citizens of Ottawa. They held their first meeting in a tent on the land in question. In 1903 a lease was entered into between the trustee and the chautauqua association for this ground for five years at an annual rental of $50, with an option of five years more. An auditorium was erected costing $3700; an artesian well was dug at a cost of $500; water pipes were laid and improvements made, and in 1906 it became necessary to put in sanitary plumbing, as during the time the chautauqua association was holding its meetings large crowds of people were on the ground and some three hundred people lived there during such meetings. July 31, 1906, an option was given to the chautauqua association to purchase, for $1517, 30.34 acres from the trustee, Leland. In pursuance of this option, on September 28, 1906, the money was paid to the trustee and he deeded to the chautauqua association the land in question. The weight of the evidence seems to show that most of this land had never been used for anything but pasturage purposes. A part of it was a gravel pit, which was then exhausted. The land was rough, covered with boulders and debris and standing water, and a few inches under the ground gravel was found, which was coarse and irregular and of small commercial value. The land cost the syndicate $45.20 per acre,

and the sale to the chautauqua association realized a profit to the syndicate subscribers of about $145. Appellant undertook to show that this price was so inadequate as to warrant the court in setting it aside as a fraud, suggesting, in this connection, that many, if not all, of the directors of the chautauqua association were directors or members of the Ottawa Development Association, and that the latter association practically had the entire charge and control of the sale of this land, through the trustee, Leland, to the chautauqua association. Appellant called several witnesses as to the price of this land, some of them not very familiar with the character of the land or its surroundings and others more or less so. Some thought the land was good for farming purposes and others for gravel purposes. We think that the weight of the testimony shows that it was not especially adapted for either purpose. While this opinion evidence for appellant tends to show that the land was then worth more than the chautauqua association paid for it, there is much evidence to the contrary. We are disposed to think that the weight of the evidence, in view of the nature of the land and its previous history, tends to the conclusion that the land was sold to the chautauqua association at a fair price. We do not think there is any evidence in the record that would justify this court in setting aside the conveyance to the chautauqua association on the ground of fraud. Furthermore, we are disposed to hold that the establishment of the chautauqua grounds on the land in question was fully within the scope and purpose of the syndicate agreement. That agreement stated three purposes for the organization, the second being, "to use, improve, develop and dispose of said lands with a view of increasing the population and business in said city of Ottawa," etc. The evidence shows that the establishment of a chautauqua on the grounds in question would not only tend to the betterment of the people of Ottawa from an educational and moral standpoint, but would also necessarily tend to in-

crease the population, and thereby the business, of Ottawa. No one would argue that public schools or churches do not have such a tendency in any city, and a chautauqua conducted as the evidence shows this to have been, would tend to promote somewhat the same interests.

It is insisted by counsel for appellant that under the third purpose as stated in said syndicate agreement it was only intended to establish manufacturing institutions by donations of lands. While that was doubtless one of the purposes, and, perhaps, in the minds of some of the subscribers the main purpose, it is very manifest that this was not the sole or only purpose, because it was stated in the agreement: "But it is agreed that failure of the third purpose [establishing the glass factory] shall not in any manner affect the first or second purpose." The establishment of the chautauqua permanently on the grounds in question, in our judgment, was clearly within the letter and spirit of this syndicate agreement. Conceding, for the sake of the argument, that the property was sold for something less than its actual market value, the trustee would have been fully justified by this agreement in deeding the property to the chautauqua association for the price heretofore set out.

Appellant further insists that the sale of the 6.95 acres of the platted syndicate land to the Ottawa Silica Company for $1737.50 in January, 1907, should be set aside, claiming that the price was inadequate. The Ottawa Silica Company had established its works, without any aid from the syndicate or development association, near the land purchased by the syndicate previous to the sale here in question, and had purchased at two different times pieces of the syndicate land from the trustee. The appellant does not complain as to these earlier purchases, but he insists that the sale of blocks 43, 54 and 55 of the Valley addition of the platted portion of the syndicate land (which make up the 6.95 acres in question) should be set aside. This land cost the syndicate $314.70, and hence it was sold at a profit

of $1422.80. During these years, for the purpose of disposing of the land to a better advantage, the trustee, under the direction of the development association, expended, for the purpose of securing transportation facilities:

For joint switch track for steam railroad right of way
on the lands................................... $684 63
For right of way to lands........................ 8,315 74
For the construction of the switch................ 27,116 13

Total ...................... ....................$36,116 50
For extending the track of the Northern Illinois Light
and Traction Company........................'.. $8,000 00
Federal extension ................................ 3,865 00

Total paid out for transportation................$47,981 50

At the time the switch track facilities were put in there was a certain agreement made with the railroad companies as to reducing the charge of switching, to the advantage of factories or buildings located on the land in question. Before these switching facilities were in, these three blocks appear not to have been worth above $45 an acre. Prior to this purchase the silica company had made the two former purchases of land from the syndicate at $220 and $225 per acre. Appellant had selected some of his lands under his preferred certificates immediately adjoining these three blocks in question, and the evidence tends to show that he was talking about starting some kind of plant on this land to use sand obtained therefrom. About this time he had some talk with the secretary of the development association and some of the officers of the Ottawa Silica Company as to buying part of the silica company's property or selling his lots to them, but no final conclusion was arrived at by the parties at that time. On January 18, 1907, the Ottawa Silica Company obtained an option on these three blocks for $250 an acre. The officers of the development association talked about advertising for bids, but it was finally decided that because of this option with the silica company the land should be sold to it, and at the next meeting, on January

25, 1907, it was decided to accept the offer of the silica company. At this time appellant had made no offer for any of these three blocks. A few days previous to this he had gone on a business trip to Texas, and on January 26, 1907, the day after the offer of the silica company had been accepted, he telegraphed from Texas to the secretary of the development association that he would give $350 per acre for block 43. Before the deed was made for the three blocks to the silica company the secretary of the development association told the other officers of the contents of this telegram, but the testimony shows they decided they would stand by their agreement with the silica company, not only because they were in honor bound to do so, if not legally bound, but also because they thought it was for the best interests of the syndicate subscribers to sell the three blocks for the price in question rather than to sell one block to appellant. Counsel for appellant seem to insist that he made a higher offer for the entire three blocks than was paid by the silica company. The record does not bear out this contention. The evidence tends to show that appellant wished to purchase block 43 for the purpose of shutting out the silica company from switching facilities. There is no evidence in the record, except this offer for block 43, tending to show that $250 per acre was not as much as any of these blocks were worth. Indeed, there is no witness for the appellant, except himself, who attempts to say that the blocks in question were worth more than $250 per acre, the price paid by the silica company. If the syndicate subscribers, at the time of this offer by Hossack for block 43, had only been interested in that one block and in no other lands, and had no other interests in connection with the syndicate agreement except the sale of this block, then, clearly, if the trustee and those who were legally advising him could have sold the property to him for $350 instead of to the silica company for $250, there would have been some basis for appellant's contention that it was the duty

of the trustee to sell for this higher price. We do not find it necessary to decide whether the trustee could legally have refused to convey, under the option, to the silica company on the date in question. We cannot escape the conclusion, on this record, that the interests of the syndicate subscribers at that time, considering all the property rights that they then had, were best conserved by selling the entire three blocks in question to the silica company at $250 per acre rather than by selling one block to appellant at $350 per acre. There is nothing in this record that tends to show that this sale to the silica company was tainted with fraud.

There are further and additional reasons why appellant is not entitled to have the conveyances to the Ottawa Chautauqua Association and the Ottawa Silica Company set aside, which we will now take up and consider in connection with another question raised by appellant.

Appellant charges mismanagement and incompetence on the part of the development association and the trustee in connection with the conduct of the affairs of the syndicate. Aside from the sales of the land to the chautauqua association and the silica company, the important acts that appear to be complained of as showing lack of business sagacity and mismanagement are the payment of the $12,000 bonus to Seiberling under the first contract, the conveyance of the land to him valued at about $8000, and the releasing of the $80,000 bond given by Seiberling and associates to the association. The subscribers to the syndicate fund must have known when they put their names to the agreement that the work the development association was undertaking for Ottawa and its citizens, and for the furtherance of which the syndicate agreement was executed, was not to be conducted upon an entirely safe business basis. A development association of this nature, or a syndicate organization established for the purposes here shown, must take greater risks than ordinary business ventures. Indeed, a person with any business experience must have

known, when signing this agreement, that he might run a risk of losing a very large part, if not all, that he subscribed. While at one time it appeared as if there might be a substantial loss to the subscribers to the syndicate fund, from this record we are compelled to conclude that the subscribers who still own their certificates will lose very little, if anything, on their subscriptions. All of them have had the opportunity, of which apparently all have availed themselves, to levy on land for the face value of their preferred certificates, and it will be noted that this face value is the face value of their subscriptions; and in addition to that they have been paid a dividend of thirty per cent on their common certificates, and there is still additional land which can be used as a bonus to induce other manufacturing plants or business interests to locate upon the syndicate tract. Many pages of the record are taken up with lengthy statements showing the actual work done under the direction and advice of the development association in connection with the syndicate property. Full accounts are therein set out as to the receipts and expenditures, and no question is made in this record as to their accuracy. At the meeting of the syndicate subscribers referred to, held on February 20, 1907, appellant was present. At this time practically all receipts and expenditures made previous to the filing of the bill in this case had been reported to the subscribers and audited by a committee appointed by them, and had received the approval of a majority, if not of all, of those in attendance at the meeting. Appellant himself, as we have heretofore stated, was present at the meeting and took part in the discussions. We think it is evident from the record that he then knew of the sale of the land to the chautauqua association and to the silica company, and that he did not in any manner express dissatisfaction with these transactions or with the conduct of the business by the trustee, under the advice and direction of the development association. Indeed, it is testified that he stated at

244—19

that meeting, publicly, that he thought the development association and those who had charge of the affairs of the syndicate had conducted them in the best manner possible. He does not offer to return a part of the thirty per cent dividend paid him on his common certificates, although part of this money was received from the sale of the lands to the chautauqua association and the silica company. His answer to the contention that he should do so is, that there are still ample funds of the development syndicate, received from the chautauqua association, the silica company and from other sources, to re-pay the purchase prices, respectively, paid by the association and the silica company. The evidence is, as we have seen, that the chautauqua association has made costly improvements on its land.

Appellant further contends that he is entitled to have the affairs of the syndicate taken charge of by a court of equity and an account taken of all money received and paid out in connection with these various transactions, and that the remaining property of the syndicate should be sold under the direction of the court and the proceeds distributed equitably among the subscribers. He argues that the syndicate agreement was practically a partnership agreement, and while he admits that neither the agreement itself, nor any of the writings entered into at or about the time the subscriber's agreement was signed, set any time within which the purposes of the syndicate agreement were to be considered as fully carried out, he claims that it was understood that it was to be within a reasonable time, and that this record clearly shows that such reasonable time was understood to be within two or three years, or at latest, long before the filing of his bill in this cause.

The subscribers to the syndicate agreement in many respects, under the decisions in this State, should be held to be partners. In discussing a very similar agreement, this court, in *McDowell* v. *Joice,* 149 Ill. 124, said (p. 136): "For the purpose of determining the fiduciary relations ex-

isting between the association and its members, the association itself, through all the mutations in its membership, may be regarded, at least in equity, as an ideal entity, involving and possessing equitable rights and relations, which, if not identical with, were at least analogous to, those existing between partners." In *Pettis* v. *Atkins,* 60 Ill. 454, this court held that a voluntary association organized as a joint stock company but incorporated for the purpose of conducting a banking business must be governed, in a measure, like a partnership. The court stated, on page 457 : "The law is well and uniformly settled that persons may not, as to themselves, be partners, and yet, as to other persons, incur the same liabilities as if they were, in fact, partners."

The legal status of unincorporated societies and voluntary associations has not been very satisfactorily determined on many points. While the courts will generally treat the members as ordinary partners and the associations as partnerships, they will, as far as possible, give effect to the articles of association or agreement among the members themselves, when they themselves are the only ones interested. If such an association be organized for pecuniary profit, so far as the rights of third persons and liabilities of the members to strangers are concerned, such association is usually considered as a partnership. (*Robbins* v. *Butler,* 24 Ill. 387; *Hodgson* v. *Baldwin,* 65 id. 532; *Wadsworth* v. *Duncan,* 164 id. 360; *People* v. *Rose,* 219 id. 46; *Ashley* v. *Dowling,* 89 N. E. Rep. 434; 25 Am. & Eng. Ency. of Law,—2d ed.—pp. 1130-1136; 1 Bacon on Benefit Societies and Life Insurance,—3d ed.—chap. 2; *Donald* v. *Guy,* 127 Fed. Rep. 228; *Baltimore Trust and Guaranty Co.* v. *Hamilton,* 40 L. R. A. 216, and note.) This syndicate agreement made the subscribers substantially a stock company. There is nothing illegal in such an agreement with transferable shares. The transferability of the shares makes such an association different, not merely

in magnitude but in other ways, from ordinary partnerships, because the association is not based upon mutual trust and confidence in the skill, knowledge and integrity of the other partners. The sale of shares by a member, the shares being transferable, is not a dissolution, and the death of a member is not a dissolution. That the shares are transferable is evidence of the intent that such death or transfer shall not result in a dissolution./ (1 Bates on the Law of Partnership, sec. 72; *Alvord* v. *Smith,* 22 Mass. 232; *Phillips* v. *Blatchford,* 137 id. 510; 4 Cyc. 315, and cases cited.) As we understand appellant's argument, he contends that under this agreement any subscriber has a right to have the partnership closed out at any time he desires. Even if this were an agreement which should be governed in all particulars the same as a partnership contract, that would not necessarily follow. The contract of partnership can no more be canceled contrary to its terms by the act of one of the partners than any other contract. (*Burgess* v. *Badger,* 124 Ill. 288.) It is very evident from the tenor of the syndicate agreement, as well as from all that took place in connection with its execution, that there was no definite date intended when the affairs of the association should be closed up.

It is contended that this agreement, taken in connection with the declaration of trust executed by Leland, should be terminated, because, it is insisted, the object for which the trust and the agreement were executed has been accomplished, citing *Kohtz* v. *Eldred,* 208 Ill. 60. (See, also, *Armstrong* v. *Barber,* 239 Ill. 389.) The record does not sustain this contention. Appellant did not attempt to make the other individual subscribers to the syndicate agreement parties to this cause. He has alleged that he owns and represents about one-sixth of the subscriptions that were paid under the syndicate agreement. It is asserted by counsel for the appellees, and the record tends to support this assertion, that all of the other subscribers to the syndicate

agreement who paid their money are opposed to selling the remaining property of the syndicate and closing out its affairs. No subscriber to this syndicate agreement has joined, in this record, with appellant in asking to have the affairs of the syndicate closed up. As has been stated, appellant in his pleadings states that he does not wish to interfere with the contract of the Federal Plate Glass Company now operating on the land purchased with the syndicate money and donated to the company. The contract with that company cannot be entirely completed until 1913, as it provides that not less than five years after the date (January 7, 1907,) of the contract additional lots shall be conveyed to the glass company at the rate of fifty for each one hundred workmen employed over and above four hundred, until two hundred lots in all have been so ·conveyed, and the terms of this contract have been extended so that it will not expire until January 7, 1913. In view of appellant's position in the pleadings and briefs, that he does not wish to disturb or interfere in any way with the contract of the Federal Plate Glass Company, it might well be held that he would be precluded from asking to have the business affairs of the syndicate closed up until after the contracts with that company have expired.

It is insisted that the syndicate agreement, and the declaration of trust by Leland, which gave to the Ottawa Development Association certain powers of advice and direction as to the syndicate fund, are contrary to public policy and therefore void, and that any subscriber to the syndicate fund is entitled to have a court of equity close up its affairs at any time. The argument of appellant is, that the Ottawa Development Association could not take this land in its own name; that through this declaration of trust and syndicate agreement it, in effect, does indirectly that which it could not do directly; that a court of equity should look through mere forms gotten up by the

parties to avoid plain provisions of the law and decide according to the real substance of the transactions. Our attention is called to *Coleman* v. *S. R. T. R. Co.* 49 Cal. 517, and other authorities, as upholding the contention of appellant on these points. In that case the court held that as the *cestuis que trust* mentioned in a certain bond were the stockholders in a company and the trustees in a declaration of trust were given power to sell and convey the land under the direction of the board of trustees of said company; there was no room for doubt that the company was the real *cestui que trust* and in equity it should be so regarded. That company was organized for pecuniary profit, but here the development association was organized not for pecuniary profit. Its officers and members are giving, and have given, their services and time to the company here in question without pay or hope of reward, except in so far as they will participate in the general benefits that will come to the city of Ottawa and its citizens by the establishment of factories and other institutions to be located in or near Ottawa. Neither the development association nor its members, as such, can receive, under the syndicate agreement or this declaration of trust, any pecuniary benefits whatever.

It is further insisted that under the decisions of this court which have been recently reviewed in *Imperial Building Co.* v. *Board of Trade,* 238 Ill. 100, the development association cannot own and control real estate. Those authorities hold that a corporation's existence cannot be attacked collaterally when there is a law authorizing the organization of such corporation and an attempt in good faith to organize thereunder and acts of user, but if there is no law authorizing such organization there is no corporation. *de facto* and no estoppel to deny the corporate existence. It is not questioned that there was a law under which the Ottawa Development Association could be legally organized and that it was legally organized in good faith.

The legality of the organization of this corporation can not, therefore, be questioned collaterally in this proceeding. (*People* v. *Shedd,* 241 Ill. 155.) Counsel for appellant apparently concede this, but insist that they are not attempting to question the organization of this company but only its right to own and control real estate, their argument being, that the association, in effect, through the syndicate agreement and declaration of trust, is owning and controlling real estate. It has been held that a corporation organized not for pecuniary profit can take and hold as much real estate as is necessary for the purpose of its organization. "Where a corporation may, for some purposes, acquire and hold the title to real estate, it cannot be made a question by any party, except the State, whether the real estate has been acquired for the authorized uses or not." (*Hamsher* v. *Hamsher,* 132 Ill. 273; *Santa Clara Female Academy* v. *Sullivan,* 116 id. 375.) All the lands, as well as moneys and property, of the syndicate have been used to further the purposes for which the development association was organized. Appellant's contentions as to these questions are not well founded. Furthermore, while it may be conceded that the general rule is that corporations, being creatures of the law, cannot exercise powers not given to them by their charters, and for that reason cannot act as trustees in matters in which they are interested or in matters that are inconsistent with and repugnant to the purposes for which they are created, and therefore, if forbidden to own or hold land, cannot act as trustees of land, yet it has been held that if the trusts are within the general scope of the purposes of the organization of the corporation or relate to matters which will promote and aid the general purpose of such corporation, it may take and hold land in trust and be compelled to execute such trusts if it accepts them. (1 Perry on Trusts,—5th ed.—sec. 43, and cases cited; see, also, *Merchants Building Improvement*

*Co.* v. *Exchange Building Co.* 210 Ill. 26; *Richelieu Hotel Co.* v. *Military Encampment Co.* 140 id. 248.) On the facts here we are not prepared to hold that the syndicate agreement and declaration of trust are not within the law.

The authorities cited by appellant on the question of *ultra vires* are not in point in this case. We have already considered substantially all the arguments urged by counsel on this point, and do not deem it necessary to take up and discuss these authorities in detail.

Appellant insists that he was induced to purchase certificates from the original subscribers to the syndicate fund because he understood that the officers of the development association and many of the subscribers to the fund were in favor, at the time of such purchase, of closing out at once the affairs of the syndicate. We do not think that fact would justify a court of equity in closing out the affairs of this syndicate.

The evidence is very voluminous and the record a large one. We have not attempted to set out in this opinion, already of too great length, all the details of the various transactions, but we have stated sufficient to show what the material questions are and the equities of the case. Nothing is set forth in the bill or found in the record that would justify a court of equity in taking charge of the syndicate affairs, requiring an accounting from all parties interested and a settling up of the business and distribution of the assets equitably among the subscribers. The purposes for which the syndicate was organized have not been accomplished. The evidence in the record tends strongly to indicate that the best interests of the syndicate subscribers will be subserved by not closing up its affairs at the present time. There is nothing in the record that indicates either fraud or mismanagement.

What has already been said renders it unnecessary to decide certain other questions argued in the briefs.

The circuit court di̥ not err in dismissing the bill for want of equity. The decree of that court will therefore be affirmed.

*Decree affirmed.*