(No. 21888.—

THE HARMONY WAY BRIDGE COMPANY, Appellee, *vs.*
EDGAR LEATHERS *et al.* Appellants.

*Opinion filed October 21, 1933.*

P. J. KOLB, for appellants.

CONGER & ELLIOTT, and ROBERTS & ROBERTS, for appellee.

Mr. CHIEF JUSTICE ORR delivered the opinion of the court:

From a decree of the circuit court of White county rendered in February, 1933, in favor of the Harmony Way Bridge Company, appellee, upon a bill in chancery filed by the bridge company, Edgar Leathers and Nellie Leathers, his wife, have appealed.

By its bill appellee sought to establish a constructive trust, or in the alternative asked that a certain deed conveying right of way to the State of Illinois for Bond Issue Route 139 be reformed so as to correctly describe all of the land desired by the State. In addition to various affirmative defenses, appellants in their answer denied holding the land in trust, averring that they purchased it for their private use and benefit alone.

The Wabash river, a portion of which is the boundary between Illinois and Indiana, flows approximately north and south between White county, Illinois, and the city of New Harmony, Indiana. For many years a ferry had been operated between New Harmony and the opposite Illinois shore. The land in Illinois opposite New Harmony is bottom land several miles wide, subject to inundation by the periodic rises of the waters of the Wabash river. A gravel roadway traversing these bottom lands to the ferry landing is subject at those times to overflow. Under the one hundred million dollar bond issue, Route 139 was to be constructed from Crossville, in White county, easterly across the river bottom to the river's edge. Various efforts were made to construct a highway bridge connecting the Illinois shore with New Harmony. One Illinois corporation, the Harmony Way Bridge Company, succeeded in having all but one of the concrete piers for the bridge built by the Nashville Bridge Company, which had the contract for the build-

ing of the piers and bridge. As the bridge company organized under the laws of Illinois did not sell its bonds the pier work could not be paid for when completed. An agreement was reached with the Nashville Bridge Company and the Illinois corporation which provided for the incorporation of the Harmony Way Bridge Company under the laws of Delaware, the Nashville Bridge Company taking preferred and common stock of the Delaware corporation in payment for the pier work and first mortgage bonds for the steel work. This scheme was carried out, with the result that the Nashville Bridge Company owned the majority of the stock of the new corporation and nearly all of the company's bonds. The State of Illinois insisted that Route 139 should terminate at the edge of the river rather than at the west approach of the bridge. On the other hand, it was to the financial interest of appellee that Route 139 should terminate at the west approach of the bridge and not continue on to the river's edge, for if it could divert all of the traffic across the bridge the corporate income would be greater. From the record it appears that the ferry was an active competitor for traffic because of tariffs approximately one-half of those established by appellee. Access to the ferry was had by turning north at the west approach of appellee's bridge and then proceeding east to the water's edge. This was the old established route, existing long before the bridge was built. However, after work was started to erect the bridge a flood stage of the Wabash river washed out some of the Illinois shore, including a public highway along the river bank, so that a new approach to the river's edge was deemed necessary by the State at a point south of the bridge. It was over this new way to the river's edge that this dispute is centered.

Appellant Edgar Leathers (who will hereafter be separately referred to) was elected a director of appellee in November, 1929, when it was chartered under the laws of

Delaware. He continued to serve as such director until in March, 1931. Ulys Pyle has been secretary and director and Roy Clippinger president and director since appellee was organized. B. B. Askew and R. W. Williams, of Nashville, Tennessee, were members of the board of directors of appellee as representatives of the Nashville Bridge Company. O. P. Vincent was for a time treasurer of the bridge company, holding such office at the time of the execution of a certain escrow agreement dealt with at length later in this opinion. Appellant was also vice-president of the bridge company for a time prior to the annual stockholders meeting in March, 1931, and had also acted as superintendent in charge of the bridge.

The evidence clearly discloses that it was to the immediate financial interest of appellee that the amount of traffic over the bridge be brought to as great a volume as possible within the shortest available time. This could best be accomplished by obtaining the construction of the hard road from the then terminus of uncompleted Route 139 across the bottoms on an elevation, to the west approach of appellee's bridge. The accomplishment of this would give all-the-year-round access to the bridge over a concrete slab elevated above the periodic high waters of the Wabash river. To further this road construction appellee contributed $10,000 for the purchase of the right of way required by the State. A strip of land along the Illinois bank of the Wabash river starting north of the bridge, running then south under the bridge and to a point south thereof, was used by the operator of the ferry as a landing place on the Illinois shore. The exact spot of landing was not a fixed one but shifted from time to time along the shore line of this strip, as required by the stage of the river and other conditions. The land involved was in 1929, after the incorporation of appellee, owned by a family named Camy. It was roughly 300 feet in width and extended about 1000 feet along the river bank. On June 28,

1930, appellant purchased this strip of land from the Camy family for $740, the deed running directly to him as grantee. Inasmuch as the high water in the spring of 1930 had washed out the public highway along the Illinois bank of the Wabash river, the public authorities of White county attempted to condemn another road some distance back from the river bank, on the land afterwards deeded by the Camy family to appellant. This attempt to condemn was ultimately defeated, and in April, 1931, the Department of Public Works and Buildings of the State abandoned the public highway to the river and ferry landing on the north side of appellee's bridge and made the new location from the west bridge approach down to a point on the river bank south of the approach, to a point where the original ferry highway parallel to the river had terminated. This established a physical situation whereby the contemplated right of way crossed the south end of the strip of land deeded by the Camy family to appellant in order that the river could be reached. Appellee, while desiring that Route 139 be completed to the west approach of its bridge as soon as possible, was just as solicitous in not wanting the route extended to the river bank, thereby aiding its competitor, the ferry. With other deeds, a dedication deed was prepared by the Department of Public Works and Buildings for a portion of the right of way over the tract of land purchased by appellant from the Camy family. In this particular dedication deed the engineers for the department erroneously described the land desired for the State, this erroneous description placing the land too far to the east, putting a portion of the wanted right of way in the river, consequently leaving a strip about 112 feet long on the west side of the land in question that was not covered by the deed. Appellant and his wife refused to sign this deed and condemnation proceedings were instituted in September, 1930. This erroneous description was continued in the condemnation proceedings, which

finally failed on the ground that the State was without authority to condemn the land because of its material departure from the existing highway in locating the proposed route. No appeal was ever taken from that judgment of dismissal of the county court and the State did not proceed with the construction of the road.

Appellee, in furtherance of its efforts to do away with the competition of the ferry, participated with appellant in the first part of the action to condemn the right of way across the land in dispute. This error in the deed of dedication was discovered by appellant before the trial in the condemnation proceedings. Appellant contends that he informed R. W. Williams, secretary and treasurer of the Nashville Bridge Company, who was also a director of appellee, of the existence of the error at this time. To secure the completion of Route 139 to the west approach of its bridge appellee entered into an escrow agreement with appellant after the failure of the condemnation suit. This agreement is as follows:

"This instrument, by and between Edgar Leathers, as party of the first part, and Harmony Way Bridge Company of Carmi, Illinois, as party of the second part, witnesseth:

"That the first party agrees to sell to second party, and second party agrees to buy of first party, first party's stock in Harmony Way Bridge Company, consisting of 453 shares preferred stock and 4233 shares common stock, on the following terms:

"Second party is to put in escrow in First National Bank of Carmi, Illinois, ten thousand dollars, the same being the purchase price of said stock, which purchase price is to be paid over to first party when the contract is let by the highway department of the State of Illinois for the remainder of State Bond Issue Route No. 139, the same being a portion of the highway leading from Crossville, Illinois, to the bridge of second party at New Harmony, Indiana, bids for which letting have already been advertised for and received by said State highway department. It being understood that first party also executes and delivers his deed for that portion of right of way for said road which has been required by said State highway department. Upon the awarding of said contract, then said first party is to deliver to said First National Bank his said stock, and thereupon said First National Bank is to pay

over the said $10,000 to said first party and deliver the said stock to second party. It being understood and agreed, however, that this escrow shall extend for thirty days, and in the event said contract is not awarded within that time, or within such other and further time as may be mutually agreed upon, then said $10,000 is to be returned to second party and this agreement is to become null and void.

"Dated this 18th day of December, 1931.

EDGAR LEATHERS,

HARMONY WAY BRIDGE CO.,

Attest: Ulys Pyle, *Secretary*."     By Roy Clippinger, *President*.

Appellant and his wife executed the deed for the right of way to the State of Illinois, this deed containing the erroneous description whereby about 112 feet of the needed land was not deeded to the State. The contract for the construction of the remainder of the route was let. Appellant surrendered his stock and received the $10,000 under the agreement. After the contract was let the erroneous description in the deed was discovered, and a person who had allegedly deeded her portion of the right of way for the route on consideration that it would be carried direct to the river bank on the south side of the bridge approach enjoined the construction of the road over her land. The work by the State on the highway was stopped by reason of the injunction, and thereupon appellee brought this suit against appellants to require them to convey the strip of ground needed to complete the right of way.

Appellant testified that at the time he acquired the land in question neither he nor appellee, so far as he knew, was aware that Route 139 was to be located and established across that land. He said that he bought the land in order to control the ferry rights; that it had another value, of gravel rights; that at no time after he bought the land did he offer to give it to the Nashville Bridge Company or to the Harmony Way Bridge Company; that there was no agreement at any time that he should acquire and hold this land in trust for the use and benefit of appellee. He

contended that there was an agreement between himself and Williams, representing the Nashville Bridge Company, that he should not allow a road to go across his ground to the river and that Williams was to pay certain sums for his services. He said that after the condemnation suit he tried to get Williams to put the agreement in writing. This Williams refused to do, but did state that appellant would be paid some on it. According to the record appellant was asking $50,000 and wanted payment of half that amount, but Williams said appellee had only authorized him to pay $7500. Appellant said Williams talked with Pyle and Clippinger and then sought him again, and he was led to believe that he was going to be paid $15,000.

Appellant, Williams, Clippinger and Pyle met in the latter's office, where the escrow agreement had been written up. Appellant said that he and Williams had agreed not to let Pyle and Clippinger know anything about the erroneous description in the dedication deed. Subsequently Williams and he met in the office of a banker by the name of Hall, where they decided to deliver the deed containing the erroneous description to the State on the theory that the State would let the contract and when the road was completed to the bridge approach an injunction suit would stop it. Appellant stated that the escrow agreement agreed upon and signed had reference only to the erroneous description contained in the dedication deed. "The $10,000 mentioned in the escrow agreement," said the appellant, "was to apply on the $50,000 he agreed to pay me for my stock." He further said that there was absolutely no mention of the fact that the dedication deed did not cover all of the land desired by the State. He contended that he received no compensation for the deed—that it was purely a gift to the highway department. A special meeting of the board of directors of appellee was held September 19, 1930, and the records of the meeting disclose that among the bills presented for allowance was one of appellant for

$900 for services rendered. This was satisfied by delivery to appellant of a $1000 bond of appellee at a valuation of ninety cents on the dollar. Ford, Askew, Clippinger, Leathers and Pyle were the directors present. Each of these directors testified as to what transpired at this meeting with reference to whether appellant had purchased the tract in question for himself or really for and on behalf of appellee.

Clippinger, a director and president of appellee, related that appellant came to him and expressed a desire to buy the land in question and that he wanted the witness to go on his note at the bank for the purchase money. Appellant, this witness said, went to the Camy people and made the arrangement, and they requested that the witness come over and give his consent so it would be all right with appellee if the land was purchased. Clippinger said that appellant told him that Hall, who was president of the First National Bank, would loan him the $800 if he would sign the note personally. The witness signed the note and appellant got a deed to the land. This witness related that appellant told him he wanted the rights in case he wanted to operate a ferry. This witness said that when the $900 bill was allowed at the directors' meeting and paid with the bond appellant turned the bond over to him, and that he sold it and paid the $800 note out of the money and the balance was turned over to appellant. No action had been taken by appellee, according to this witness, regarding the purchase of this land, prior to the time appellant said he wanted to buy it. He further said that appellee was in no way liable on the note by which the purchase money was borrowed as it was solely an individual transaction of his own, but that it was the understanding of the directors that appellant was getting enough money out of the bond to reimburse him for what he had paid for the land, together with some other items. Clippinger also testified that the motion was made to pay appellant for services rendered, but only after there had been a prior

discussion thereof. The bill was discussed, and it was understood that the $900 included what appellant had been out on the purchase of the land. The witness further said that Askew discussed the matter more at length than any other director, and that Askew thought it best to have the record show "services rendered" instead of showing that appellee had purchased the land. The witness stated that nothing was said at the time as to what appellant should do with the land.

Askew, another director, testifying as to what transpired, said that appellant presented his bill for $900 to be reimbursed for his services and the purchase price of the land in question. The witness said he was in favor of paying the bill but that he objected to appellee carrying the land in its name, and it was his objection that changed this bill from real estate to services rendered. He took this stand, he said, because he did not want to get appellee in any entanglement with the ferry. The witness was positive that appellant asked to be reimbursed for the purchase price of the land, and further stated that appellant said he was willing to carry it in his own name for appellee and intended to deed the property any time appellee saw fit.

Ford, another director, testified that Askew brought it up that appellant had bought the land, and they wanted to take it over and pay him. Nothing was said as to whose name the land was to be carried in, and that a part of the $900 was for the purchase price and part of it was a claim.

Pyle testified that appellant's bill for $900 was discussed, and that it was understood by all of the directors that it embraced the reimbursement of appellant for the purchase of this land. He did not recall any discussion as to what disposition was to be made of the land or about the conveyance of the title, although he remembered that Askew said something about who should hold the title.

Appellant testified that the bill he presented at the meeting under discussion was purely for services rendered which

were unrelated to the land in question, contending that he only sought compensation for work covering almost a year. He said that there was no agreement that any part of the $900 was to be paid out for the land, but that, on the contrary, it was in payment for services he was in a position to render, and did render, due to the fact that he owned the land in question. He denied agreeing at the meeting to convey the land to appellee or that he bought the same for its benefit.

Williams, secretary and treasurer of the Nashville Bridge Company and a director of and also a member of the executive board of the appellee before and after the time the land in question was purchased, said appellee was interested in the acquisition of this land before appellant acquired it, for its acquisition would be the means of finding whether or not the ferry could continue to operate without a license. On several occasions he had discussed with appellant whether it would be desirable for appellee to acquire the land, and that in the beginning he was not in favor of it but was finally won over by appellant. He testified that appellant telephoned him long distance in Nashville and stated that he could secure the land for $900 and wanted to know if it would be all right for appellant to draw a draft on the Nashville Bridge Company for that amount. This the witness authorized him to do, but the draft was never drawn, and he subsequently learned from Clippinger by what means the land had been purchased for only $740. Subsequently, when with the witness in Nashville, appellant replied to an inquiry that he had not conveyed the land but that he would. Williams further stated that he was present with appellant at a meeting held in the office of the Nashville Bridge Company about January 1, 1931, and that one Dyer, an officer of the Nashville Bridge Company, asked, "Do we own this land?" and that appellant replied, "Yes; I hold it in my name." It was after the condemnation proceedings were over that this

witness said he learned that appellant had not deeded over the land to appellee but was holding it on an offer that if he were paid $50,000 for his stock he would deed the land. "We let the matter drift," he said, "until Clippinger and Pyle wired that they could secure the property for $15,000." This offer was refused. The witness said that appellant reduced the offer to $10,000, which would be approximately twice what the stock was worth. He came to Carmi and dictated the escrow agreement. Under this escrow agreement the witness said the stock was eventually received and the $10,000 paid over to appellant. This witness also categorically denied the statement that appellant had acquainted him with the erroneous description before the agreement was entered into and that they had entered into the secret agreement heretofore detailed.

Clippinger, who executed the agreement on behalf of appellee, said he was present when the agreement was made, and that he did not learn of the erroneous description until some weeks after appellant had received the $10,000. When he signed the agreement for appellee he believed that the description in the dedication deed would convey the right of way required by the State. Pyle, who attested the agreement as secretary of appellee, stated that at the time the agreement was entered into, and in the negotiations prior thereto, appellant gave no inkling of the error. Vincent, who as treasurer for appellee paid over the $10,000 to appellant, said that up to the time of the payment he possessed no knowledge whatever that there was any error or misdescription of any kind in the dedication deed. He first obtained knowledge of the error in January, 1932. Appellant, testifying as to this matter, said: "The reason for keeping this [the erroneous description] from Judge Pyle and Clippinger was that they would have blowed up about it. I knew there was conflict with the interests of the Harmony Way Bridge Company. * * * There was absolutely no mistake on my part as to what this deed to

the State contained. I knew it never covered all of the ground, and delivered it with full knowledge of that fact."

We must accept the evidence as conclusively determining that appellant deliberately refrained from informing appellee of the erroneous description in the dedication deed. This not only constituted a breach of confidence on his part as an officer of appellee, but is equally conclusive that his act was fraudulent, done for the purpose of benefiting himself at the expense of appellee.

By way of an affirmative defense appellant argues that the Statute of Frauds provides that no trust can be created unless the same is manifested by some writing signed by the party to be charged with the trust, and also because the same statute requires all contracts for the creation of an interest in real estate for a longer period than one year to be in writing. This defense is based upon the premise that the evidence does not sustain the findings in the decree—*i. e.,* that the portion of the real estate in question was in equity the property of appellee under the' doctrine of resulting trust. This point has no merit, as the doctrine of resulting trust is in nowise involved in this action, since the purchase money was not paid by appellee at the time of the purchase of the land in question and a subsequent payment will not invoke that doctrine. *Metropolitan Trust and Savings Bank* v. *Perry,* 259 Ill. 183; *Hummel* v. *Villmow,* 347 id. 58; *Kinsch* v. *Kinsch,* 348 id. 446.

Appellant affirmatively asserts that the record did not warrant the finding that he held the real estate in question in trust for appellee under the doctrine of constructive trusts. In support of this point he argues that while he was a director of appellee he did not acquire the real estate in question adversely to its interests; and further, that appellee exceeded its charter powers by seeking indirectly to control ferry rights. The record furnishes no basis for either of these contentions. The proof falls far short of showing that appellee and appellant confederated to un-

lawfully and by indirect means engage in the operation of a ferry or control the ferry rights in the neighborhood of the bridge. The evidence contains innuendoes to that effect, but they do not constitute proof upon which the court below could base a finding that they were so engaged. Appellant in giving his story of the matter said he wanted the land in order that he could run a ferry. This would necessarily compete with the bridge. The evidence does show that one of the reasons why appellee desired to own the land in question was to determine in a legal way the right of the ferry to run without a franchise.

Nor can we agree with appellant that the land in question was in no manner essential to the business which appellee could lawfully engage in under its charter powers. While general rules of construction are of aid in determining the question of essentiality, in the last analysis, however, each case must be determined upon the particular facts involved therein. It is true that a corporation organized under the laws of this State may exercise only those powers which are expressly conferred upon it by statute and other powers which are essential to carry those expressed powers into effect, (*People* v. *Pullman Car Co.* 175 Ill. 125; *Mercantile Trust Co.* v. *Kastor,* 273 id. 332;) and when a foreign corporation is licensed to do business in this State it enjoys the same, but no greater, privileges, and comes under the same restrictions as a domestic corporation. (Cahill's Stat. 1931, chap. 32, sec. 84.) In construing the power of corporations to hold real estate it must be reasonably necessary that they hold such property for corporate purposes. *Calumet Dock Co.* v. *Conkling,* 273 Ill. 318.

The evidence clearly discloses the existence of particular circumstances which motivated appellee in its efforts to acquire the land in question. The original Illinois company created for the erection of the bridge did not possess the necessary financial strength to carry the project to com-

pletion. It was heavily involved with the Nashville Bridge Company for the pier work and had to consent to its dissolution and the creation of the appellee corporation. Appellee was also deficient in financial resources and was unable to sell its stock or bonds, and the Nashville Bridge Company had to take its pay for the construction of the bridge entirely in stock and bonds which possessed no established market value. The income of appellee was dependent upon the bridge tolls, and it was imperative that appellee increase the 'traffic across its bridge to the highest possible volume within the shortest space of time. It needs no argument to show that this could best be done, and done with propriety, by aiding the State in acquiring the necessary right of way for Route 139. It cannot be said that the charter powers of appellee to "construct, maintain, own and operate a toll bridge" were exceeded by the acquirement of land necessary for right of way to bring Route 139 to its bridge approach, even though the fixed terminus of the route was at the water's edge. There is no statutory prohibition against appellee securing land for any purpose. Whether it exceeded its authority or whether the land was needed for corporate purposes are questions that in the first instance must be decided by appellee, always subject, however, to the right of the State to challenge the legal propriety of any particular acquisition of land. This right of challenge accrues to the State alone, and here the question cannot be litigated between appellee and appellant. *Hossack* v. *Ottawa Development Ass'n*, 244 Ill. 274; *Bartee Tie Co.* v. *Jackson*, 281 id. 452.

There are exceptions to the general rule that the State is the only one with the power to challenge the right of a corporation to hold land, as when the enforcement of a general contract is sought and there is a direct statutory prohibition against such a contract either party may plead *ultra vires*—even a party who has received the benefit of the contract. But suffice it to say that this case does not

394

fall within the exceptions relied upon by appellant and the cases cited in support thereof, as appellee here had the right, under its charter, to acquire and hold real estate. Also it has been the policy of the law in this State that a plea of *ultra vires* should not, as a general rule, prevail when it does not advance justice but on the contrary would accomplish a legal wrong if allowed. (*Kadish* v. *Garden City Building Ass'n,* 151 Ill. 531.) Closely connected with this stated policy is the principle of estoppel where one has obtained the benefit and advantage of a contract or a transaction. In such case the law will not allow him to set up a lack of holding power, either in himself or the other party, when asked to perform his portion of the undertaking. The case last cited stated the principle of estoppel very well when it was said: "It is now very well settled that a corporation cannot avail itself of the defense of *ultra vires* when the contract has been in good faith fully performed by the other party. * * * The same rule holds *e converso.* If the other party has had the benefit of a contract fully performed by the corporation he will not be heard to object that the contract and performance were not within the legitimate powers of the corporation." Estoppel applies very patently to the circumstances of the present case, for appellant has been reimbursed, as the evidence unequivocally shows, for the purchase money. Capping this is the fact, as established by the evidence, that appellant callously took advantage of the critical and embarrassing situation of appellee, and virtually compelled it, through the force of the circumstances then existing, to pay him $10,000 in money for a defective deed under the guise of purchasing his stock, which was practically of no value whatever. To allow such unconscionable conduct to prevail would be highly inequitable, and appellant cannot now object that the contract and performance were not within the legitimate powers of the corporation. *Kadish* v. *Garden City Building Ass'n, supra.*

A constructive trust has been defined to be one that arises where a person possessing a fiduciary character, by fraud or otherwise gains something for himself. (Perry on Trusts, sec. 27; *Reed* v. *Reed,* 135 Ill. 482; *Stahl* v. *Stahl,* 214 id. 131.) A constructive trust is created when legal title to property is obtained by a person because of a confidential relation and influence. Equity and good conscience require that under such circumstances a person ought not to hold and enjoy the beneficial interests of the property. To prevent the perpetration of wrong the courts will by construction raise a trust converting the holder of the legal title into a trustee and make the necessary orders that will protect the rights of the wronged or defrauded party. (Perry on Trusts, sec. 166; *Pope* v. *Dapray,* 176 Ill. 478; *Miller* v. *Miller,* 266 id. 522; *Kern* v. *Beatty,* 267 id. 127.) Officers and directors of a corporation occupy a confidential relation to the corporation; (Corpus Juris, vol. 14A. pp. 97, 98; Perry on Trusts, sec. 207, pp. 364, 365.) A corporate director who purchases property which he knows the corporation will need, and then sells the same to the corporation at an advanced price, abuses the trust reposed in him. (*Higgins* v. *Lansingh,* 154 Ill. 301.) The suppression of material facts which should be known in the pending transaction is equivalent to the assertion of a falsehood. (*Mitchell* v. *McDougall,* 62 Ill. 498.) The doctrine of equitable estoppel will not allow the party in the wrong in such circumstances to set up his legal title, for he has so conducted himself in regard thereto in a manner contrary to equity and good conscience. (*Thor* v. *Oleson,* 125 Ill. 365.) Such estoppel is founded upon a fraudulent purpose and a fraudulent result. *Chandler* v. *White,* 84 Ill. 435; *Knapp* v. *Jones,* 143 id. 375; *Holcomb* v. *Boynton,* 151 id. 294.

The only conclusion which the lower court could logically have reached from the evidence, the material parts of which are included in this opinion, is the one stated in

the decree. Appellant had filled the office of a director of appellee, was for a time its vice-president and bridge superintendent, and was fully acquainted with all of its plans and policies concerning the desired right of way of Route 139. He knew the vital importance of the tract of land in question to appellee. He derived this information because of his fiduciary relations with appellee and upon the confidence reposed in him. All the while he was presumably advancing the interests of appellee by purchasing the desired tract of land from the Camy family he was consciously and secretly working for his own personal advantage and gain.

The point is made that the court below was without power to correct the error in the deed because the mistake was not mutual to both parties. It is true the mistake was not mutual, for appellant knew of the error when he signed the deed while appellee did not know of it. We cannot quarrel with the general legal principle advanced by appellant, but we must disagree with his view that the doctrine is applicable to the circumstances of this case. The bill was not framed upon the theory of mutual mistake but was framed upon appellant's violation of confidence as a fiduciary and upon his fraud. He is bound by the wording of the escrow agreement. The agreement does not mention a specific deed nor state specifically the description to be contained in the deed by metes and bounds. It did provide that appellant "executes and delivers his deed for that portion of right of way for State road which has been required by said State highway department." That phraseology surely called for a deed conveying the right of way clear across the strip in question, for attached to the deed and made a part of it for reference is a plat which showed the correct location of the land desired, extending from the water's edge across the tract to the westerly edge thereof.

By injecting as an affirmative defense the lack of authority on the part of the State to depart from the exist-

ing highways in laying out the right of way of Route 139, and by also asserting that the judgment of the county court of White county in the condemnation proceedings was *res adjudicata,* appellant introduces matters which are entirely collateral to the issue. The escrow agreement was entered into after the condemnation proceedings had terminated. The failure to condemn was the impelling cause of the agreement. The county court in its judgment did not decide where the road should or should not be built. It merely found that as to the individual interest of appellant the power to condemn did not exist. Fraud and the violation of confidence, aided by the judgment of the county court on the merits of condemnation, enabled appellant to secure $10,000 from appellee. We cannot countenance his urging the lack of power to condemn as justification for failing to give the land for which he received the sum of $10,000, as such a result would allow appellant, through aid of the court, to profit by his deceitful conduct.

We cannot agree with appellant that the escrow agreement recognized his ownership of the tract in question. Consequently appellee is not estopped in asserting its claim of ownership.

Inasmuch as we have held that the circumstances created a constructive trust, appellee, consequently, is no stranger in so far as the dedication deed is concerned. Under the circumstances, equity will gaze directly through the screen of legal camouflage erected by appellant and discern the true owner, and as to the reformation of the deed will find that the rightful owner is the true party in interest and not the holder of the legal title, whose presumed rights rest upon fraud and a violation of confidence.

By the same reasoning it cannot be said that the dedication deed was without consideration and purely voluntary. While as to the State it possibly was a voluntary conveyance and the State itself might not be able to correct this deed, it was not a voluntary conveyance from the stand-

point of appellee. Moreover, appellant received $10,000, for which he was to turn over his stock and give the needed right of way to the State. The evidence shows that the deed was a part of the consideration.

*Laches* on the part of appellee is further urged as a defense by appellant. This defense possesses no merit, as a suit to enforce the trust was not necessitated until the officers of appellee found that the dedication deed was erroneous and that appellant was unwilling to correct it. The final refusal on the part of appellant to perform was in the early part of 1932 and the bill was filed in October of that year. This is not such delay as constitutes *laches*.

The decree is attacked on the ground that it is inconsistent. Appellant alleges that the decree follows the bill, and that the latter is framed on two theories: First, that the real estate in question is in equity the property of appellee under the doctrine of trusts; and second, failing in this, that appellant is bound, in law, to convey a portion thereof to the State as right of way for a highway under the theory that there was a mistake in the description in the deed to the State. He alleges that the bill prays for alternative relief. It is said that the bill does not pray that both things be done, and that the decree does not conform to the relief prayed, in that it gives to the State the portion desired for the right of way and gives the remainder to appellee. The prayers for relief are: First, a constructive trust; second, in the alternative, for the reformation of the deed; and third, a general prayer for other and further relief. Where a bill in chancery contains a general prayer for relief it must be regarded as sufficient to support any decree warranted by the facts alleged in the bill. (*Walker* v. *Converse*, 148 Ill. 622; *Crawford* v. *Hurst*, 299 id. 503; *Seely* v. *Board of Education*, 315 id. 186.) We have held that a constructive trust has arisen, consequently the entire ownership is taken from appellant. It is therefore immaterial to him whether the whole title goes

direct to appellee, or only a major portion thereof to appellee and a minor fraction thereof to a party interested through or under it. The decree of the court below merely carried out the intent of appellee to give the needed right of way to the State—an intent which had been frustrated by the concealment of appellant, who as one of appellee's officers fraudulently violated a fiduciary and confidential relationship.

By virtue of the facts found and the law stated, the decree of the circuit court of White county is affirmed.

*Decree affirmed.*