RAYMOND G. GRAHAM *et al.*, Plaintiffs-Appellees, *v.* FRANK W. MIMMS *et al.*, Defendants-Appellants.

First District (5th Division) Nos. 80—3233, 81—0166 cons.

Opinion filed December 17, 1982.

754

Reuben & Proctor, of Chicago (Don H. Reuben, Gary M. Elden, Andrew D. Eichner, and James A. Klenk, of counsel), for appellants Frank W. Mimms and Wyclif & Co.

Marconi & Morrison, of Chicago, for appellants Thomas Fuller and Sarah Fuller.

William J. Harte, Ltd., and Joyce & Kubasiak, P.C., both of Chicago (William J. Harte, Edward T. Joyce, and James E. Dahl, of counsel), for appellees Raymond G. Graham and James T. Rodgers.

JUSTICE LORENZ delivered the opinion of the court:

In the first of two consolidated appeals (Nos. 80—3233 and 81—0166), defendant Frank W. Mimms, the controlling shareholder in Mimms & Co., Inc., appeals from a judgment which found that he breached the fiduciary duties he owed to Mimms & Co. and its minority shareholders (plaintiffs Raymond G. Graham and James T. Rodgers) by misappropriating corporate assets and opportunities.

Mimms argues that the judgment should be reversed on the grounds that (a) the business opportunities which Mimms pursued on his own behalf were not Mimms & Co. corporate opportunities; (b) the trial court ordered more restitution than is justified by the record or

by equitable principles; and (c) Graham and Rodgers are guilty of wrongful conduct which requires that they be deprived of an equitable remedy for Mimm's own misconduct.

In the second case, defendants Thomas and Sarah Fuller appeal from a judgment holding them jointly and severally liable with Frank Mimms for restitution of almost $1,400,000. The dispositive issue for the Fullers is whether they obtained any property or benefits from their alleged wrongdoing upon which a constructive trust could be fastened.

The record discloses the following evidence:

Graham, Rodgers, and Mimms were experienced condominium salesmen who went into business together in April of 1976 so that they could (a) convert rental buildings into condominiums; (b) obtain "project sales" listing agreements to sell the units in rental buildings which were being converted into condominiums by other developers; and (c) broker the resale of individual units in existing condominiums. Their enterprise was named Mimms & Co., and for brevity we shall refer to this entity as "Mimco."

It was agreed that all business decisions were to be made by a two-out-of-three vote, but that profits and salaries were to be apportioned under a formula which gave 40% to Mimms, 35% to Graham, and 25% to Rodgers. Although they decided to incorporate Mimco, their attorney, Charles Steinberg, advised them that a corporation cannot engage in the real estate brokerage business in Illinois unless the corporation is controlled by a licensed real estate broker.[1]

Since Mimms was the only one of the three who was licensed as a broker, they agreed that he would initially receive 51% of the Mimco stock, in addition to becoming president, treasurer, secretary, and sole director of the corporation. As to the nonbrokerage aspects of the business, there was an unwritten understanding that they would continue to operate under a two-out-of-three vote, and that salaries and profits would continue to be apportioned under the 40-35-25 percent formula.

Although Mimms initially controlled the corporation, a preorganization subscription agreement provided that when either Graham or Rodgers received a broker's license, the corporation would issue enough additional shares to both Graham and Rodgers so that, as

---

[1]See section 3 of "An Act in relation to the definition, registration and regulation of real estate brokers and real estate salesmen ***" (requiring that each corporate officer "who actively participates in the brokerage business of [a] *** corporation" must be a licensed real estate broker). Ill. Rev. Stat. 1975, ch. 114½, par. 103, now at Ill. Rev. Stat. 1981, ch. 111, par. 5703.

originally planned, they would respectively own 35% and 25% of the Mimco stock. It was anticipated that Rodgers would become licensed as a broker in early 1977 and that, as provided in the subscription agreement, Mimms would then lose control of Mimco.

Based on their business objectives, Mimco was divided into three divisions. Graham was placed in charge of the project division because of his experience in managing the mass "project sales" required when rental buildings are converted to condominiums. Mimms was placed in charge of the acquisition division because he believed he had the ability to obtain project listings and acquire suitable rental buildings for conversion. And Rodgers was placed in charge of the brokerage division, which was to handle the sales of miscellaneous condominium units.

The firm grew rapidly and had more than 20 employees within a few months. During the first eight months of business, the project and brokerage divisions accounted for more than $5 million in sales, despite the fact that most of their employees were trainees, and that most of their project listings were for buildings in which the developer had been having trouble making sales.

During the same period, Mimms and his acquisition division actively investigated, researched, and developed plans and proposals for potential condominium conversion projects. One of the properties checked by Stephen Clayton, a "property analyst" in the Mimco acquisition division, was the building at 100 E. Walton in Chicago. Clayton reported to Mimms that the building would make a good conversion project, and Mimms ordered Clayton to conduct additional investigation of its suitability for conversion. Charles Steinberg, Mimco's attorney, testified that Mimms ordered him to ascertain the ownership of several rental buildings, including 100 E. Walton. In the fall of 1976, according to Steinberg, Mimms ordered him to find out whether the 100 E. Walton building was for sale. Mimms also warned Steinberg:

> "Don't tell them who you are representing because if they know we are in the condominium field, the price they say they want for the building may be higher."

Steinberg contacted one of the owners, Kenneth Marks, and pressed for financial information concerning the building even though Marks claimed he wasn't presently interested in selling. Mimms ordered Steinberg to do a title search so that they could be sure they were negotiating with the actual owners. And, following the initial conversation with Marks, Steinberg sent him a letter which stated:

"Dear Ken:

You may recall about two weeks ago we discussed the possible availability for the purchase of the above project, and you said you were in the process of preparing figures and would be pleased to send a copy to us.

Our client remains very much interested and we shall look forward to hearing from you."

In addition to his efforts to investigate potential conversion projects, Mimms acted to secure financing for such developments. Plus, the evidence shows that the acquisition division prepared detailed reports and proposals for conversion projects. Mimms initially claimed he did not have the missing files of Mimco's acquisition division, but at trial, when attempting to impeach the testimony of Hyman Spector, a real estate investor who testified that Mimms asked him to provide financing for a conversion project, Mimms produced a Mimco proposal for the conversion of an apartment building owned by Spector. This proposal was prepared by the acquisition division in October of 1976, and includes detailed analyses of the housing and mortgage markets, a sales pitch, and a proposed agreement for Mimco to purchase and convert the property.

Graham and Rodgers gave the following testimony:

Mimms began calling Graham at home in early November of 1976 to discuss restructuring Mimco. According to Graham, Mimms told him that Rodgers should not share in the profits from conversion projects because the brokerage division would never be a big profit maker. Mimms also said he was working on the acquisition of several rental buildings for Mimco—including the 100 E. Walton building—but that he did not want to purchase these buildings on behalf of Mimco until the corporation was restructured.

On November 24, 1976, Mimms visited Graham at home and again reported that he was ready to purchase several buildings for Mimco, but that he would not proceed with these projects until Graham agreed to a reorganization. Mimms showed Graham a reorganization proposal which almost completely eliminated Rodgers from receiving any of the profits generated by the conversion projects Mimms had been pursuing on behalf of Mimco, and he insisted that Graham sign it immediately.

Graham refused to sign the proposal without discussing it with Rodgers first, so Graham called Rodgers and informed him of the meeting with Mimms. Rodgers went to Graham's home, and Mimms again announced that he wanted his proposal executed immediately. Rodgers read the proposal and refused to sign it. Then, according to Graham, when Rodgers rejected the proposal, "Mr. Mimms told Mr.

Rodgers that you either sign it or I am going to fire you and pay you off the bottom line and there is not going to be a bottom line."

According to Rodgers, Mimms also threatened that if they refused to sign the reorganization proposal, he would "clean the company of its assets and walk away from its remains."

Graham and Rodgers refused to capitulate, and later, using a different tact, Mimms tried to convince Graham that they should buy out Rodgers instead of just squeezing him out of the business.[2] So, on December 4, Mimms and Graham agreed to offer to purchase Rodger's interest in Mimco for $70,000. They also decided that if Rodgers refused the offer, they would dissolve Mimco and form a new corporation to take advantage of the business opportunities which had been developed by Mimms as head of the acquisition division.

Rodgers was not supposed to find out about the buy-out proposal until a written version of the agreement between Mimms and Graham was executed on December 6. However, on December 5, Graham informed Rodgers of the latest proposal, and Rodgers asked Graham to consult with an independent attorney first. Then, on December 6, after conferring with counsel, Graham told Mimms he wouldn't go along with the new agreement because he believed it would violate Rodgers' rights. Mimms responded by calling Graham "a vacillating son of a bitch," and, as president and sole director of Mimco, fired Graham on the spot.

The record also contains the following evidence:

Mimms directed Steinberg to set up a corporation named Wyclif & Co. And, even though Mimms admittedly stopped doing any work for Mimco, he paid himself $12,000 out of Mimco's funds. According to Mimms, this was an "advance against expenses."

Mimms did not name anyone to replace Graham as head of the project division, but Rodgers was able to keep things going until someone who identified himself as the president of Mimco ordered the phone company to turn off the phones at the Mimco offices.

Once the phone service was shut off, the sales personnel stopped coming to work. And, again using his authority as president and sole director, Mimms fired Rodgers and ordered him to stop visiting the Mimco offices. Mimms then resigned from his corporate positions and, as controlling shareholder, installed his sister and brother-in-law,

---

[2]See section 76 of the Business Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 157.76) (two-thirds majority required for shareholders to voluntarily dissolve corporation). Compare section 13 of the Close Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 1213), which did not become effective until October 1, 1977.

Sarah and Thomas Fuller, as Mimco officers and directors.

Mimco's office lease was terminated for nonpayment of rent, even though there had been enough money in the corporate accounts to pay Mimms his $12,000 "advance against expenses." Mimms immediately negotiated a lease for the same premises on behalf of his new corporation, Wyclif & Co., and, negotiating with his sister and brother-in-law, he purchased all the Mimco office furniture and supplies—property that was already in place in the new Wyclif & Co. offices.

On March 17, 1977, Mimms started his first condominium conversion project by purchasing a building at 636 Buckingham in Chicago for $175,000. Mimms admitted that he had been aware of this business opportunity when he was working as head of the Mimco acquisition division, but he claimed that it was not until after he had formed his own corporation that he concluded that this building was "marketable."

This initial project was financed by a mortgage and a promissory note, and Mimms did not have to pay any earnest money. At trial, Mimms explained that he was able to afford increasingly expensive buildings because he started small and poured all his profits into the next project. Accordingly, several months after purchasing his first building, Mimms purchased a rental building at 1340 Touhy Avenue in Chicago for $560,000 and converted it into condominiums. Then, in August of 1977, Mimms and a group of partners obtained bank financing which permitted them to purchase the building at 100 E. Walton for $10,500,000 and convert it into condominiums. And less than a month later, Mimms started another conversion project by using his collateral in the Walton project to purchase a building at 1040 Erie in Oak Park for $1,530,000.

Graham and Rodgers demanded that the Fullers, as Mimco officers and directors, take action against Mimms for usurping corporate opportunities and for other breaches of fiduciary duty. Furthermore, when Graham received his real estate broker's license, Graham and Rodgers demanded that Mimco issue the additional shares of stock to which they had become entitled under the preorganization subscription agreement.

The Fullers failed to act on either request, and Graham and Rodgers, acting individually and on behalf of Mimco, filed this action against Mimms, Wyclif, and the Fullers. (Although Mimco is aligned as a plaintiff, we shall use the term "plaintiffs" to refer solely to Graham and Rodgers.)

Following a bench trial, the court found that Mimms usurped six

corporate opportunities, including the four conversion projects listed above.[3] Therefore, the court imposed a constructive trust in favor of Mimco on the profits which Mimms generated from the usurped opportunities. The court used the profit apportionment formula under which plaintiffs were entitled to 60% of Mimco's profits, and ordered Mimms to pay $810,950 to Graham and $579,257 to Rodgers as restitution. However, because the financial data concerning the profits from the usurped opportunities only went up to September 1, 1978, and the judgment was entered in November of 1980, the court also ordered an accounting of the profits generated from the usurped opportunities after September 1, 1978.

The judgment further held the Fullers jointly and severally liable for the amounts awarded as restitution, on the grounds that they breached the fiduciary duties they owed to Mimco and colluded with Mimms in his breaches of fiduciary duty.

The court also found that Wyclif & Co. was merely a "continuation" of Mimco, and it ordered Mimms to transfer 35% of his shares in Wyclif to Graham and 25% to Rodgers. In their argument on the issue of an appeal bond, plaintiffs estimated that the total value of the judgment is $3,500,000.

Additional facts will be discussed in our opinion where pertinent.

## I

The first issue is whether it was against the manifest weight of the evidence to find that Mimms unjustly enriched himself by breaching the fiduciary duties he owed to plaintiffs and Mimco. Resolution of this issue requires some discussion of fiduciary obligations in general and in the context of the law of corporations.

■ Every person who accepts the responsibility of acting on behalf of another is a fiduciary. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 304, 367 N.E.2d 678, 682; Scott, *The Fiduciary Principle* 37 Cal. L. Rev. 539, 540 (1949).) The law of fiduciary obligations facilitates commercial efficiency by imposing a duty of loyalty on fiduciaries, thereby relieving the parties to such relationships of the obligation of, in every case, individually negotiating contracts which specify the fiduciary's duties in a large number of hard-to-anticipate situations. Brudney and Clark, *A New Look at Corporate Opportunities*, 94 Harv. L. Rev. 997, 999 (1981).

Common examples of fiduciaries are trustees, guardians, execu-

---

[3]Mimms has elected not to contest the trial court's finding that he wrongfully usurped two listing agreements from Mimco.

tors, administrators, agents, attorneys, partners, joint adventurers, and the directors and officers of corporations. (5 Scott, Trusts sec. 495, at 3534 (3d ed. 1967).) Each of these fiduciaries owes a duty of loyalty to the person or entity for whom the fiduciary is acting. *Dick v. Albers* (1909), 243 Ill. 231, 236, 90 N.E. 683, 685; 37 Cal. L. Rev. 539, 541.

■ Two of the functions of this duty of loyalty are to impose upon the fiduciary an affirmative obligation to disclose certain information which falls within the scope of the fiduciary relationship, and to refrain from profiting—without consent—from property or information which is considered as belonging to the beneficiary. (Dobbs, Remedies sec. 10.1, at 653 (1973).) These functions merely represent general principles, however, and the duty of loyalty is more intense in some fiduciary relationships than others. (5 Scott, Trusts sec. 495, at 3534 (3d ed. 1967); Restatement of Restitution sec. 190, Comment *a*, at 781 (1937).) Among other factors, the precise nature and intensity of the duty of loyalty depends upon the degree of independent authority exercised by the fiduciary (37 Cal. L. Rev. 539, 541) and the reasonable expectations of the parties at the beginning of the relationship. See 94 Harv. L. Rev. 997, 1010.

■ It is undisputed that the individuals who control corporations owe a fiduciary duty to their corporation and its shareholders. (*Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 278, 166 N.E.2d 793, 799; *Winger v. Chicago City Bank & Trust Co.* (1946), 394 Ill. 94, 108, 67 N.E.2d 265, 275; *Harmony Way Bridge Co. v. Leathers* (1933), 353 Ill. 378, 395, 187 N.E. 432, 439.) Instead, as in the present case, the typical disagreement concerns the substance of this duty of loyalty.

Despite the comprehensiveness of modern corporation codes, the hard questions about the fiduciary obligations of the people who control corporations have been left to the courts. (Conrad, *An Overview of the Laws of Corporations*, 71 Mich. L. Rev. 621, 648-49, 653 (1973).) In resolving these questions, "[t]he courts have been faced with the problem of evolving controls which will assure investors a reasonable protection from the unrestrained self-interest of those charged with the promotion of the corporate enterprise, and at the same time avoid an entrepreneurial paralysis affecting an important part of the business community." Note, *Fiduciary Duty of Officers and Directors Not to Compete with the Corporation*, 54 Harv. L. Rev. 1191 (1941).

■ One of the basic rules evolved by the courts in this area of corporate law is the principle that a corporation's fiduciary is not per-

mitted to use corporate assets for his or her own personal gain. (*Dixmoor Golf Club, Inc. v. Evans* (1927), 325 Ill. 612, 616, 156 N.E. 785, 787; *Voorhees v. Mason* (1910), 245 Ill. 256, 262, 91 N.E. 1056, 1058; *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 664, 344 N.E.2d 805, 814; *Melish v. Vogel* (1975), 35 Ill. App. 3d 125, 135, 343 N.E.2d 17, 25.) In addition to this proscription against misappropriating corporate property, the corporate opportunity doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities which are considered as "belonging" to the corporation (at least as far as the fiduciary is concerned). *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 289-92, 219 N.E.2d 541, 543-45, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262; *Guth v. Loft, Inc.* (1939), 23 Del. ch. 255, 272-73, 5 A.2d 503, 511.

When a fiduciary breaches his duty of loyalty by misappropriating corporate assets, or by usurping corporate opportunities, restitution can be compelled by means of a constructive trust. (See *Winger v. Chicago Bank & Trust Co.* (1946), 394 Ill. 94, 111, 67 N.E.2d 265, 276-77; see also *Black v. Gray* (1949), 403 Ill. 503, 504-05, 87 N.E.2d 635, 636.) Once a court determines that a defendant must make restitution, it simply declares that he is a "constructive" trustee, and it orders him or her to transfer the property in question to the beneficiary of this judicially created trust. Dobbs, Remedies sec. 4.3, at 241 (1973).

■ An important feature of the constructive trust remedy is that it includes the trust law rule under which the trust beneficiary can obtain restitution of the property into which misappropriated assets have been converted. (*Winger v. Chicago Bank & Trust Co.* (1946), 394 Ill. 94, 111, 67 N.E.2d 265, 276-77; 5 Scott, Trusts sec. 508.2, at 3580 (3d ed. 1967).) As Mimms points out, however, the ability to trace a misappropriated asset into its proceeds can lead to harsh results, for example, where a wrongdoer has greatly added to the value of the misappropriated property. Thus Mimms argues that it is inequitable to impose a constructive trust in the present case. But, as a matter of public policy in the corporate context, courts have been "inveterate and uncompromising" in applying the constructive trust remedy to fiduciaries who have misappropriated corporate property or usurped corporate opportunities. (*Guth v. Loft, Inc.* (1939), 23 Del. ch. 255, 270, 5 A.2d 503, 510.) This "inveterate and uncompromising" application of the constructive trust remedy "does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extin-

guishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." *Guth v. Loft, Inc.* (1939), 23 Del. ch. 255, 270, 5 A.2d 503, 510.

In the present case, the trial court found that Mimms usurped six corporate opportunities, and it remedied this misconduct by imposing a constructive trust. According to Mimms, however, the Walton, Buckingham, Touhy, and Erie conversion projects do not fall within the scope of the corporate opportunity doctrine on the ground that it was not feasible for Mimco to take advantage of these opportunities, and that Mimco could not have had a reasonable expectancy in these projects.

We disagree.

Corporations usually do not have a property interest in mere business opportunities, even though the duty of loyalty may prohibit the corporation's fiduciaries from taking advantage of such opportunities. So, as Mimms correctly points out, when a fiduciary is accused of usurping a corporate opportunity, it is relevant to consider whether it was feasible for the corporation to take advantage of the opportunity, and whether the corporation had a reasonable expectation that its fiduciary would disclose and tender the opportunity.

■ Nevertheless, the "core principle" of the corporate opportunity doctrine is that a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets. (94 Harv. L. Rev. 997, 1006 (1981).) "The principle rests on the same considerations that forbid appropriations of the assets themselves, but adds the remedy of tracing the misappropriated assets into their product—a conventional remedy in the law of trusts." (94 Harv. L. Rev. 997, 1007.) Therefore, when a corporation's fiduciary uses corporate assets to develop a business opportunity, the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, even if it was not feasible for the corporation to pursue the opportunity or it had no expectancy in the project.

As the court explained in *In re Trim-Lean Meat Products, Inc.* (D. Del. 1980) 4 Bankr. L. Rep. 243, 247:

> "[T]he proscription against appropriation of corporate property for private gain is of broader application than the corporate opportunity rule. The latter is but a specialized application of the former. It essentially treats a corporation's expectations regarding certain business opportunities which are in the corporation's line of business and of practical advantage to it as corporate property which may not be appropriated for personal gain.

On the other hand, the general proscription against misapplication of corporate funds applies equally to business opportunities outside the corporation's line of business. Thus, a business opportunity falling outside a corporation's line of business and which would not otherwise be considered a corporate opportunity, nevertheless, will be deemed a *corporate opportunity* if developed or financed with corporate funds."

■ The purpose of the equitable estoppel doctrine is to prevent fraud and injustice (*Dill v. Widman* (1952), 413 Ill. 448, 456, 109 N.E.2d 765, 769) by precluding a litigant from denying the truth of prior assertions (*Mills v. Graves* (1865), 38 Ill. 455, 464) on which another litigant has relied. (*Dill v. Widman* (1952), 413 Ill. 448, 455-56, 109 N.E.2d 765, 769.) In the present case, there is compelling evidence that Mimms used Mimco employees, and his own time as a Mimco executive, to research and investigate potential conversion projects; to pursue financing for these projects; and to develop comprehensive conversion plans and proposals. The evidence that the Walton project was researched, investigated, and developed by Mimms with Mimco assets is overwhelming, and Mimms' conduct in aggressively pursuing this opportunity with Mimco assets constituted an implied assertion (upon which the corporation, at his direction, relied) that the project constituted a corporate opportunity of Mimco. Consequently, it was not against the manifest weight of the evidence to find that Mimms was estopped from denying that the Walton project constituted a corporate opportunity of Mimco, even if Mimco lacked the financial capacity to take advantage of the project. To hold otherwise would cause a fraudulent effect.

■ Furthermore, it was not against the manifest weight of the evidence to find that plaintiffs, and Mimco, had a reasonable and justifiable expectation that Mimms would disclose and tender *all* the conversion projects he discovered, researched, or developed through his use of Mimco employees and his work as the corporate executive in charge of discovering, researching, and developing such business opportunities. Yet, despite the overwhelming evidence that Mimms withheld multiple corporate opportunities from Mimco and plaintiffs, Mimms argues that plaintiffs failed to prove that the Buckingham, Erie, and Touhy projects constituted corporate opportunities belonging to Mimco.

■ At the threshold of our discussion of this question, we note that, as majority shareholder and dominant figure in the control of the corporation, the fiduciary duties Mimms owed to Mimco and plaintiffs did not cease when he resigned as officer and director and in-

stalled his sister and brother-in-law in those positions.

"If *** the controlling shareholder in fact assumes a dominant role in the management and development of the business by electing directors and selecting officers subservient to his will, the absence of a title clearly should not relieve him from the fullest sweep of an executive's affirmative obligation." Note, *Corporate Opportunity*, 74 Harv. L. Rev. 765, 770 (1961).

Mimms was not merely the majority shareholder of Mimco. Acting through his sister and brother-in-law, Mimms clearly retained total control over Mimco, and it was not against the manifest weight of the evidence to find that he continued to owe fiduciary duties to the corporation and its minority shareholders even after resigning his corporate positions. Moreover, Mimms took advantage of both the corporate form and his dominant role as majority shareholder (for example, by using his corporate authority to fire plaintiffs), and it was not against the manifest weight of the evidence to find that Mimms was estopped from contending that the corporate identity of Mimco should be disregarded in determining the rights of its principals. (Compare *Koestner v. Wease & Koestner Jewelers, Inc.* (1978), 63 Ill. App. 3d 1047, 381 N.E.2d 11.) Therefore it was also not against the manifest weight of the evidence to find that Mimco continued to exist as a corporate entity until it was dissolved by operation of law (for nonpayment of the franchise tax) in December of 1977.

This case reveals the inherent difficulty in proving that a business opportunity was developed or discovered through the use of intangible corporate assets such as the time an executive spends working for his or her corporation. For example, Mimms kept most of the activities of the acquisition division secret from plaintiffs, and the files of that division were "missing" (except for a conversion proposal which Mimms was able to produce for the first time at trial in an attempt to impeach one of plaintiff's witnesses). However, it was not against the manifest weight of the evidence to find that Mimms was precluded from taking advantage of the Buckingham, Touhy, and Erie conversion projects because he failed to disclose and tender these opportunities to plaintiffs.

The Illinois rule is that when a corporation's fiduciary wants to take advantage of a business opportunity which is in the corporation's line of business (as is clearly the case with the projects in question), the fiduciary must first disclose and tender the opportunity to the corporation, notwithstanding the fact that the fiduciary may have believed that the corporation was legally or financially incapable of taking advantage of the opportunity. *Kerrigan v. Unity Savings Asso-*

*ciation* (1974), 58 Ill. 2d 20, 28-29, 317 N.E.2d 39, 43-44.

Since Mimms took advantage of the Buckingham, Touhy, and Erie projects while he continued to owe a duty of loyalty to Mimco, it was not against the manifest weight of the evidence to find he was precluded from taking advantage of these opportunities because he failed to disclose and tender them to plaintiffs. See, *e.g., Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 28, 317 N.E.2d 39, 43 (holding that a corporation's officers and directors were foreclosed from taking advantage of a business opportunity that was in the corporation's line of business because they failed to disclose and tender the opportunity to the corporation's shareholders).

■■ Additionally, once plaintiffs proved that Mimms used corporate assets to investigate and develop several potential conversion projects, Mimms had the burden of proving which, if any, of his conversion projects were not the proceeds of misappropriated Mimco assets.

■ A well-established rule of trust law is that when a trustee commingles trust funds with nontrust funds, he has the burden of untangling the mess. (*Robert P. Butts & Co. v. Estate of Butts* (1970), 119 Ill. App. 2d 242, 248, 255 N.E.2d 622, 626.) This rule is also applicable to the fiduciaries of corporations. In *Winger v. Chicago Bank & Trust Co.* (1946), 394 Ill. 94, 111, 67 N.E.2d 265, 277, the supreme court applied this principle of trust law to corporate directors who breached their fiduciary duty, explaining that,

> "there is a duty resting upon [corporate directors, as quasi-trustees] not to commingle their own property with that of the beneficiaries [citation], and when they do so commingle, in cases where the fiduciary relation exists and they have obtained the property by reason and because of the fiduciary relationship, the burden then rests upon the trustees to show by strong and convincing evidence, the property, or the part thereof that belonged to them before the commingling took place." See also 94 Harv. L. Rev. 997, 1008-10 (suggesting that in source-of-information cases, the fiduciary should have the burden of proving that knowledge of a business opportunity was not obtained through his or her connection with the corporation).

This rule is typically applied when a fiduciary has commingled money, but it is equally "applicable where things other than money are mingled so as to form one indistinguishable mass." 5 Scott, Trusts sec. 520, at 3642 (3d ed. 1967).

It was not against the manifest weight of the evidence, in the

present case, to find that plaintiffs proved Mimms used Mimco assets to investigate and develop a number of potential conversion projects. But only Mimms could prove which, if any, of his conversion projects were not corporate opportunities of Mimco. As far as plaintiffs were concerned, this group of projects formed one indistinguishable mass, and Mimms had the burden of sorting them out.

■■ This conclusion is also compelled by the principle that "[t]he burden of producing evidence, chiefly, if not entirely, within the control of an adverse party, rests upon such party if he would deny the existence of claimed facts." (*Belding v. Belding* (1934), 358 Ill. 216, 220, 192 N.E. 917, 919.) It is not enough for Mimms to say that plaintiffs cannot prove which conversion projects were developed with Mimco assets, since it was within his power to conceal the evidence needed to sort things out. (See *Winger v. Chicago Bank & Trust Co.* (1946), 394 Ill. 94, 115, 67 N.E.2d 265, 279.) "It is the wrongdoer's own fault that he cannot identify his own contribution" (5 Scott, Trusts sec. 515, at 3611 (3d ed. 1967)), and Mimms, the wrongdoer in the present case, failed to meet his burden of sorting out the commingled projects.

We are not justified in reversing a trial court's findings of fact unless they are clearly against the manifest weight of the evidence. (*Curran v. Curran* (1960), 19 Ill. 2d 164, 169, 166 N.E.2d 13, 17; *Finney v. White* (1945), 389 Ill. 374, 381, 59 N.E.2d 859, 862.) But a finding is not against the manifest weight of the evidence merely because the record might support a contrary decision. (*People ex rel. Lauth v. Wilmington Coal Co.* (1949), 402 Ill. 161, 167, 83 N.E.2d 741, 745.) We conclude that, in light of the controlling principles of law, it was not against the manifest weight of the evidence to find that the Walton, Buckingham, Erie, and Touhy conversion projects were misappropriated corporate opportunities belonging to Mimco.

## II

The next issue concerns the propriety of the equitable remedies imposed on Mimms and the Fullers.

## A.

Mimms argues that the trial court erred in computing the amount (almost $1,400,000) which it found represents the proceeds of the usurped opportunities. Plaintiffs respond that the trial court properly imposed a constructive trust on (1) all the compensation which Mimms received from Wyclif (almost $500,000), and (2) all the profits made by Wyclif. However, we find that the trial court erred.

Although it was proper to impose a constructive trust on the proceeds of the usurped opportunities, Wyclif was involved in a number of projects which are unrelated to the present case, and the court erred in imposing a constructive trust on *all* the profits generated by Wyclif. Furthermore, plaintiffs agree that Mimms was entitled to reasonable compensation for his efforts in developing the usurped opportunities (see Dobbs, Remedies sec. 4.3, at 243 (1973)) and the court also erred in imposing a constructive trust on *all* the compensation Mimms received from Wyclif.

Plaintiffs argue that rather than remanding for recalculation, we should simply reduce the amount of restitution by what we consider an appropriate amount. According to plaintiffs, we can ascertain the appropriate amount of restitution by referring to various tax returns which were entered into evidence.

■■■ We disagree, however, because we are unable to perform the trial court's function of tracing the proceeds of the misappropriated opportunities. We simply cannot ascertain, for example, what portion of the compensation Mimms received from Wyclif constitutes the proceeds of the usurped opportunities, or what amount Mimms should receive as reasonable compensation for his work. These are questions of fact for the trial court. Consequently, we must reverse the portion of the judgment which awarded plaintiffs $1,400,000 in restitution, and remand for recalculation of the amount constituting the proceeds of the corporate opportunities usurped by Mimms.

### B.

The trial court also imposed a constructive trust on the stock of Mimms' new corporation, Wyclif & Co., based on its findings that (1) plaintiffs would have owned 60% of Mimco but for Mimms' misconduct, and (2) Wyclif is merely a "continuation" of Mimco.

By holding that Wyclif is merely a "continuation" of Mimco, and thereby imposing a constructive trust on the stock of the "successor" corporation, the trial court, in effect, pierced the veils between separate corporate entities.

■■ According to plaintiffs, the constructive trust imposed on the stock of Wyclif & Co. is appropriate on the grounds that Mimms breached his fiduciary duty by destroying Mimco and picking up the pieces for his new enterprise. However, we conclude that plaintiffs had an adequate remedy at law, and it was an abuse of discretion to impose the equitable remedy of piercing the corporate veil.

Disregarding the corporate form, or piercing the corporate veil, is an equitable remedy. (*Tilley v. Shippee* (1958), 12 Ill. 2d 616, 623, 147

N.E.2d 347, 352.) But generally, an equitable remedy will not be imposed when there is an adequate remedy at law. (*Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 333, 356 N.E.2d 67, 68.) To the extent that Mimms breached his fiduciary duty, for example, by destroying Mimco so that he could pick up the pieces for his new enterprise, he can be held liable for damages. "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Restatement (Second) of Torts sec. 874, at 300 (1979); see, *e.g., Wilkes v. Springside Nursing Home, Inc.* (1976), 370 Mass. 842, 353 N.E.2d 657.

We conclude that plaintiffs had an adequate remedy at law, and we therefore reverse the portion of the judgment which imposes a constructive trust on the stock of Wyclif & Co. and remand for further proceedings on the question of damages.

Plaintiffs point out that the judge who presided over the trial of this case has retired and, because the trial court found that Mimms' misconduct was malicious and extremely outrageous, plaintiffs argue that we should award them punitive damages rather than remand for further proceedings before another judge.

Mimms counters by pointing out that (1) the trial court expressly declined to grant punitive damages; (2) plaintiffs initially filed a cross-appeal from this ruling; and (3) the cross-appeal has been withdrawn. Thus Mimms concludes that plaintiffs have waived the issue of punitive damages.

As for plaintiffs' argument, we recognize that we have been given the authority to "give any judgment and make any order that ought to have been given" by the trial court. (73 Ill. 2d R. 366(a)(5).) However, even if we concluded that the trial court "ought" to have awarded punitive damages, we could not determine what amount of punitive damages the trial court "ought" to have imposed. This is a question of fact for the trial court. And, the identity of the trial court remains the same even if the judge presiding over a case has retired. (*Department of Public Works v. Legg* (1940), 374 Ill. 306, 309, 29 N.E.2d 515, 517.) Therefore, it is not significant that the judge who presided over this case has now retired.

In light of Mimms' waiver argument concerning punitive damages, it is appropriate to point out the scope of the trial court's authority on remand.

A reviewing court may, in an appropriate case, order a new trial on the issue of damages. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275, 285-86; 73 Ill. 2d R. 366(a)(5).) It necessarily follows that we are also authorized to reverse

the portion of a judgment which imposes a constructive trust and remand for further proceedings on the issue of damages. Moreover,

"When [as with a portion of the present judgment] a decree is reversed and the cause is remanded without specific directions, the judgment of the court below is entirely abrogated, and the cause stands there as if no trial had occurred. The trial court then has the same power over the record as it had before its judgment or decree was rendered." *Kinney v. Lindgren* (1940), 373 Ill. 415, 420, 26 N.E.2d 471, 473.

In the present case, we are reversing the portion of the judgment which imposes a constructive trust on the stock of Wyclif. On remand the trial court starts with a clean slate as to this portion of the case, and it can impose any appropriate remedy for the wrongs which caused it to impose the reversed constructive trust. The fact that plaintiffs withdrew their cross-appeal from the order denying punitive damages does not limit the trial court's authority on remand.

### C.

The trial court found that the Fullers breached the fiduciary duties they owed to plaintiffs and Mimco, and that they colluded with Mimms in his breaches of duty. Based on these findings, the court made the Fullers and Mimms jointly and severally liable for the $1,400,000 in restitution which Mimms was ordered to pay to plaintiffs. However, "A constructive trust does not arise unless there is property on which the constructive trust can be fastened, and such property is held by the person to be charged as constructive trustee [citation]." Restatement of Restitution sec. 160, Comment *i*, at 648 (1937).

The record shows that the full extent to which the Fullers profited as a result of their alleged breaches of fiduciary duty was that Thomas Fuller represented Mimco at 15 real estate closings and received $100 for each transaction. Plaintiffs do not claim that this constitutes unjust enrichment, and because the record does not show that the Fullers received any other benefit from their alleged breaches of duty, we find no basis in the record for imposing upon them the obligation of making restitution in the sum of $1,400,000. As far as it reaches the Fullers, the judgment imposing a constructive trust must be reversed.[4]

---

[4]Because of our resolution of No. 81—0611, we need not decide whether it was against the manifest weight of the evidence to find that the Fullers breached their fiduciary duties and colluded with Mimms in committing his breaches of duty.

### III

■■ Finally, Mimms argues that plaintiffs are guilty of wrongful conduct which should preclude them from obtaining any equitable relief. Under the "Clean Hands" doctrine, "A person may be prevented from obtaining restitution for a benefit because of his criminal or other wrongful conduct in connection with the transaction on which his claim is based." (Restatement of Restitution sec. 140, at 562; see also sec. 179, at 722 (1937).) This principle was traditionally expressed in the equitable maxim that "He who comes into equity must come with clean hands." (See generally 2 Pomeroy, Equity Jurisprudence sec. 397 *et seq.*, at 90 *et seq.* (5th ed. 1941).) Nevertheless, "It is not sufficient to bar relief that inequitable conduct should relate to the proof of some item or some fact, and *where the origin of the claim is not inequitable,* a fraudulent act in relation to it will not bar relief." (Emphasis added.) *Shadden v. Zimmerlee* (1948), 401 Ill. 118, 128, 81 N.E.2d 477, 482.

In determining whether to preclude equitable relief, the trial court should consider all the circumstances of the particular case (Restatement of Restitution sec. 140, Comment *b,* at 563 (1937)), but the result of depriving an injured plaintiff of an equitable remedy can only be justified on the grounds that it would tend to deter the type of misconduct exhibited by the plaintiff, or that the public should not have to bear the expense of sorting out the claims of the parties. Restatement of Restitution sec. 140, Comment *a,* at 562-63 (1937).

According to Mimms, plaintiffs should be deprived of an equitable remedy for the following reasons:

1. Graham "took" a client away from Mimco, and attempted to "take" another client from Mimco, *after* he had been fired by Mimms.

2. Graham started a new business and hired several Mimco employees for his new enterprise, *after* he had been fired by Mimms.

3. Plaintiffs deposited $16,000 of corporate funds in escrow, *after* Mimms had threatened to loot the company, and *after* Mimms, as sole Mimco director, issued a resolution which gave him sole control of the corporate bank accounts.

4. Plaintiffs "destroyed" Mimco's banking relationship by keeping the firm's bank officer informed of Mimms' threats to loot the company, and by having a stop order issued for $8,000 in checks which, *after* his threats to loot the company, Mimms issued to himself and his "property analyst."

5. Plaintiffs "disrupted" the sales force when they tried to stop the squeeze-out by declaring themselves in control of the corporation (as they naively thought they could under the unwritten understand-

ing that there would be a two-out-of-three vote on nonbrokerage decisions).

6. When the phones were shut off, and the sales personnel abandoned the office without turning in their keys, Rodgers had the locks changed to protect the company property, but he didn't give Mimms a new key.

7. After they were fired by Mimms, plaintiffs received commissions for several real estate transactions which had originally been listed with or negotiated at Mimco.

8. Rodgers punched Mimms twice—one time within a month of when Mimco was established, and once after he and Graham had been squeezed out of the business.

9. Rodgers threatened to "destroy" Mimms if Mimms destroyed Mimco, and he drew a cartoon which shows Mimms as a Napoleon declaring "I am the President!" while standing on a pedestal which is being chopped down by Rodgers.

10. When they were squeezed out, Graham took a company desk, and Rodgers took some files from the brokerage division.

11. After the judgment was entered, plaintiffs filed garnishment summonses with the trial court clerk two hours before the expiration of a trial court order which stayed efforts to enforce the judgment.

12. After the appellate court issued a stay order, plaintiffs did not withdraw the garnishment summonses which were served during a three-hour gap between when the trial court's stay order expired and the appellate court's stay order was issued.[5]

---

[5]Mimms filed a motion in the appellate court for a rule ordering plaintiffs to show cause why they should not be held in contempt for (1) filing garnishment summonses with the trial court clerk two hours before the trial court's stay order expired; and (2) not withdrawing the previously served garnishment summonses after the appellate court issued its stay order.

These summonses were not served until after the trial court's stay order expired, and, as plaintiffs point out, if they had not been prepared to serve these garnishment summonses the moment the trial court's stay order expired, Mimms would have been free to bury his assets in an attempt to frustrate his judgment creditors. However, we cannot resolve the question of precisely what conduct was prohibited by the trial court's order because, even if plaintiffs committed a contempt by filing these summonses with the trial court clerk two hours before the trial court's stay expired, it was a contempt of the trial court, not this court.

As for the failure to withdraw the summonses which were served before the appellate court's stay order was issued, the appellate court order merely prohibited further action to enforce the judgment, and it was not until later that the appellate court ordered plaintiffs to withdraw the garnishment summonses. Both of these orders were apparently complied with, and Mimms' motion for a rule to show cause is hereby denied.

■■■ All but one of the instances of alleged misconduct by plaintiffs occurred after Mimms threatened to fire them and loot the company unless they knuckled under to his reorganization proposal. Not even the most sensitive court of equity could insist that minority shareholders in a close corporation must react with the equanimity of St. Francis of Assisi when they are being squeezed out of the business that provides their livelihoods. Mimms remained the dominant party in Mimco at all times, and it was neither against the manifest weight of the evidence, nor an abuse of discretion, to find that the alleged misconduct which occurred after Mimms began to put his squeeze-out scheme into effect was collateral to Mimms' misconduct, and did not justify depriving plaintiffs of an equitable remedy.

Mimms emphasizes his argument that plaintiffs are guilty of unclean hands on grounds that *they* destroyed Mimco. Even if the record could support such findings, we cannot conclude (after our prolonged study of a record which includes thousands of pages of trial transcripts, boxes of exhibits, and hundreds of pages of appellate briefs) that it was against the manifest weight of the evidence to find that Mimms destroyed Mimco so that he could pick up the pieces (including corporate opportunities) for his new corporation.

Mimms additionally emphasizes his contention that Graham, who became one of three Mimco directors (along with the Fullers) in March of 1977, breached the fiduciary duty he owed to Mimco. Specifically, Mimms claims that Graham was guilty of unclean hands on the grounds that, after he was fired by Mimms, he hired Mimco employees for his new enterprise, and allegedly induced a developer to breach its listing agreement with Mimco so that he could get this listing agreement for himself.

To say that Graham was a fiduciary is merely the first part of the appropriate analysis because, as we noted earlier, the intensity and content of the duty of loyalty varies depending upon the degree of independent authority exercised by the fiduciary, and the reasonable expectations of the parties at the beginning of the fiduciary relationship.

First, it is relevant to note that Graham never exercised any significant authority over the affairs of Mimco, even after he became a director. This conclusion is not undercut by the fact that plaintiffs naively believed that Mimms' power as majority shareholder could be limited by an unwritten understanding about a two-out-of-three vote among the shareholders concerning nonbrokerage matters.

Furthermore, when Graham became a minority Mimco director, he had already been squeezed out of the business, and there could not have been any reasonable or justifiable expectation that he would re-

frain from competing with Mimco. We find that it was neither against the manifest weight of the evidence, nor an abuse of discretion, to find that Graham was not guilty of any misconduct which should preclude him from obtaining equitable relief for Mimms' misconduct.

While Rodgers' conduct in striking Mimms is inexcusable, this intemperate behavior did not make him an outlaw who lost the right to have a court remedy unrelated wrongs.

"The [unclean hands] rule does not go so far as to prohibit a court of equity from giving its aid to a bad or faithless man or a criminal. The dirt upon plaintiff's hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction his hands are as clean as the court can require." *Mills v. Susanka* (1946), 394 Ill. 439, 445, 68 N.E.2d 904, 907.

The connection between Rodgers' wrongful conduct and Mimms' own misconduct is tenuous, and depriving Rodgers of an equitable remedy would not have any significant effect in decreasing the number of batteries which are committed between business associates. In short, under the circumstances of this case, it was neither against the manifest weight of the evidence, nor an abuse of discretion, to find that Rodgers' misconduct was collateral to Mimms' misconduct, and that Rodgers should not be barred from receiving equitable relief.

■■■ Finally, Mimms argues that the trial court erred in ruling that he was not entitled to an equitable setoff for commissions which plaintiffs received on several condominium sales. The evidence shows that Graham's new firm received commissions for several condominium sales in which the transactions had been negotiated by Mimco employees, and the sales contracts were executed before Mimco's listing agreements were terminated. The commission from these transactions belonged to Mimco, and it was against the manifest weight of the evidence to find that Mimms was not entitled to an equitable setoff for these sales.

For the preceding reasons, the judgment of the circuit court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Specifically, we affirm the portion of the judgment which imposes a constructive trust on the profits which Mimms generated from the usurped opportunities, but we reverse and remand for recalculation the finding on the amount of restitution owed by Mimms. The portion of the judgment which imposes a constructive trust on the stock of Wyclif & Co. is reversed, and we remand for further proceedings on the issue of damages. We also reverse the portion of the judgment which holds the Fullers liable for

restitution. And finally, the trial court is directed to grant Mimms an equitable setoff for sales commissions which belonged to Mimco but were received by plaintiffs.

Affirmed in part; reversed in part and remanded with directions. Motion for rule to show cause denied.

MEJDA and WILSON, JJ., concur.